866 So.2d 612 (2003)
NORTH FLORIDA WOMEN'S HEALTH AND COUNSELING SERVICES, INC., et al., Petitioners,
v.
STATE of Florida, et al., Respondents.
No. SC01-843.
Supreme Court of Florida.
July 10, 2003.
*614 Richard E. Johnson, Tallahassee, FL; Bebe J. Anderson, Julie Rikelman, and Jody Ratner, The Center for Reproductive Law & Policy, New York, NY; and Dara Klassel, Planned Parenthood Federation of America, Inc., New York, NY, for Petitioners.
Charles J. Crist, Jr., Attorney General, and John J. Rimes, III, Assistant Attorney General, Tallahassee, FL, for Respondents.
Carol J. Banta and Heath A. Jones of Wilmer, Cutler & Pickering, Washington, DC, for Physicians for Reproductive Choice and Health and Society For Adolescent Medicine, Amici Curiae.
Randall C. Marshall, Miami, Florida; and Julie Sternberg and Louise Melling, New York, NY, for The American Civil Liberties Union, The American Civil Liberties Union of Florida, and The Women's Law Project, Amicus Curiae.
*615 Stephen C. Emmanuel and John Beranek of Ausley & McMullen, Tallahassee, FL; and Thomas A. Horkan, Jr. and Victoria H. Erquiaga, Tallahassee, FL, for The Florida Catholic Conference, Amicus Curiae.
Mathew D. Staver and Erik W. Stanley, Liberty Counsel, Longwood, FL; and Teresa Stanton Collett, Professor of Law, South Texas College of Law, Houston, TX, for The Christian Medical Association, Catholic Medical Association and American Association of Pro-Life Obstetricians/Gynecologists, Amicus Curiae.
SHAW, Senior Justice.
Section 390.01115, Florida Statutes (1999), is entitled the Parental Notice of Abortion Act (the "Parental Notice Act," or the "Act"). Because of concerns regarding the Act's constitutionality, both the trial and district courts below barred its implementation. The Act never has been enforced. We have for review State v. North Florida Women's Health & Counseling Services, 852 So.2d 254 (Fla. 1st DCA 2001), wherein the district court declared the Act valid. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. For reasons explained below, we quash North Florida and approve the trial court's decision holding the Act unconstitutional under our controlling precedent in In re T.W., 551 So.2d 1186 (Fla.1989).
Under the Parental Notice Act, prior to undergoing an abortion, a minor must notify a parent of her decision or, alternatively, must convince a court that she is sufficiently mature to make the decision herself, or that, if she is immature, the abortion nevertheless is in her best interests. The trial court analyzed the Act under T.W. and concluded that, in light of the Legislature's continued disparate treatment of minors in other statutes governing comparable procedures and practices, the Act fails to further a compelling State interest. Because the trial court properly applied the controlling law as set forth in T.W. and because its findings are supported by competent substantial evidence, we sustain its ruling.
As was the case in Planned Parenthood v. Farmer, 165 N.J. 609, 762 A.2d 620 (2000), wherein the New Jersey Supreme Court struck a similar parental notice statute, our decision today in no way interferes with a parent's right to participate in the decisionmaking process or a minor's right to consult with her parents.[1] Just the opposite. Under our decision, parent and minor are free to do as they wish in this regard, without government interference.

I

A
When the Parental Notice Act became effective on July 1, 1999, several women's clinics, women's rights groups, and physicians ("Women's Services") filed suit in circuit court seeking injunctive and declaratory relief to block its enforcement, claiming that the Act violates a minor's constitutional rights under our earlier decision in T.W. The circuit court held a two-and-one-half day evidentiary hearing and on July 27, 1999, issued a temporary injunction blocking enforcement of the Act. The State filed an interlocutory appeal in the First District Court of Appeal (the "First District"), and while that appeal was pending, the circuit court continued with the proceedings on the merits.
The circuit court in December 1999 conducted a five-day bench trial wherein the *616 parties presented numerous exhibits and depositions and the live testimony of various experts. After the trial was completed, the First District relinquished jurisdiction of the State's interlocutory appeal to the circuit court so that court could enter a final order on the merits. The circuit court on May 12, 2000, relied on this Court's holding in T.W. and ruled that (a) the Act imposes a significant restriction on a minor's right of privacy under the Florida Constitution, and (b) the Act fails to further a compelling State interest. The court held the Act unconstitutional and issued a permanent injunction barring its enforcement.
The State appealed and the First District on February 9, 2001, reversed, holding that the Act furthers a compelling State interest. Women's Services then filed a motion in district court seeking to stay issuance of the mandate and also a petition for review in this Court based on statutory validity.[2] The district court granted the stay, effectively blocking enforcement of the Act, and this Court on October 26, 2001, granted discretionary review. The case was argued before this Court on March 4, 2002. After oral argument, the circuit court, on motion of the parties, supplemented the record in this Court twice: once in March 2002, with fifteen volumes of supplemental record, and once in August 2002, with two lengthy documentary exhibits.
Women's Services contends that T.W. is controlling precedent, that the trial court faithfully applied that decision, and that this Court therefore should approve the trial court's decision. The State,[3] on the other hand, contends that this case is not controlled by T.W., or alternatively, that this Court should recede from T.W.

B
As noted above, the trial court conducted a two-and-one-half day evidentiary hearing before issuing a temporary injunction barring enforcement of the Act. The court then conducted a five-day bench trial. The following witnesses testified in person for Women's Services during trial: attorney Jamie Ann Sabino; Judge Gerald C. Martin; Michael Benjamin, M.D.; Stanley K. Henshaw, Ph.D.; Nancy E. Alder, Ph.D.; and Harry Krop, Ph.D.[4] In counterpoint, the following witnesses testified in person for the State: Rebecca I. Moorhead, M.D.; Peter Uhlenberg, Ph.D.; David Elkind, Ph.D.; and Charles R. Figley, Ph.D.[5]
The trial court, in its written order following trial, first acknowledged the Legislature's statements of fact contained in the "whereas" clauses in the preamble to the Act. The court then conducted its own inquiry based on the evidence presented at *617 trial and made its own factual findings, which may be paraphrased as follows:
As to the medical consequences of abortions, I find from the evidence that abortion is one of the safer surgical procedures.
The risk of mortality or complications from abortion are very low.
Certainly, in no qualitative sense, are the risks [of mortality or complications] higher, or more unique for abortions than they are for child birth, or for other surgical procedures for which a minor may now lawfully consent without notifying her parents.
Most minors, especially older minors, are perfectly capable of following directions for aftercare treatment.
Some minors have legitimate fears of physical and emotional abuse if their parents are consulted.
There are some minors who have good reason not to want to have their parents consulted when they see a physician about an abortion.
The fear of disclosure will motivate some minors to go to great lengths to avoid [disclosure], including delaying their decision to abort, thus increasing the risks, concealing their pregnancy, going to some other state where notice is not required, or seeking an illegal abortion.
The court addressed the Legislature's statements of purpose, which also were contained in the "whereas" clauses, and then framed the key issue facing the court:
The stated purposes for the Act follow logically from the Legislative Findings; e.g. protect minors from their own immaturity, preserve the family unit and parental authority, prevent, detect and prosecute sexual batteries against minors. I can't imagine any serious disagreement over the importance of these interests to our society. The family unit is the cornerstone of civilized society. We depend on parents to protect, guide, and socialize their children, to help to make them law abiding, productive members of the community. We hold parents responsible for their children as we shouldand we should be about the business of helping them, certainly not hindering them, in carrying out this responsibility.
The issue, though, is not whether these interests and goals are worthy and important. They clearly are. The question is whether the challenged Act is a permissible way under our State Constitution to achieve them. For the reasons outlined below I conclude that it is not.
The court reasoned that the Act imposed a direct and significant intrusion on a minor's right of privacy because, as the title of the Act implies, a minor would be required to disclose to othersi.e., to her parents, guardians, and sundry court personnelone of the most intimate aspects of her private life. The court also reasoned that the Act failed to further a compelling State interest in light of the fact that, in the intervening years since T.W. was decided, virtually nothing had changed in the statutory provisions authorizing less restrictive treatment for other comparable procedures and practices. Accordingly, the court concluded that, under T.W., the Act was unconstitutional.

C
The district court below did not articulate any standard of review governing its analysis of the trial court's decision. The court began its analysis not with a review of the trial court's factual findings and legal ruling, but with its own assessment of the underlying facts. The district court articulated several factual findings, which may be paraphrased as follows:

*618 Appropriate aftercare is critical in avoiding or responding to post-abortion complications.
Abortion is ordinarily an invasive surgical procedure attended by many of the risks accompanying surgical procedures generally.
If post-abortion nausea, tenderness, swelling, bleeding, or cramping persists or suddenly worsens, a minor (like an adult) may need medical attention.
A guardian unaware that her ward, or a parent unaware that his minor daughter, has undergone an abortion will be at a serious disadvantage in caring for her if complications develop.
An adult who has been kept in the dark cannot ... assist the minor in following the abortion provider's instructions for post-surgical care.
The risks [of complication] are significant in the best of circumstances.
While abortion is less risky than some surgical procedures, abortion complications can result in serious injury, infertility, and even death.
North Florida, 852 So.2d at 262.
Based on those findings, and without addressing the trial court's reliance on T.W., the district court concluded that one of the State's interests served by the Act the protection of minorswas indeed compelling. The court reasoned as follows:
But if the State has established that even one of [its asserted interests] is a compelling state interest and that the Act furthers that interest by means that are no more intrusive than necessary, no court has authority to strike down the Act as facially violating article I, section 23 of the Florida Constitution.
. . . .
At least one such interest has been established here. By facilitating the ability of parents and guardians to fulfill their duty to provide appropriate medical care for their daughters or wards, the Act serves a compelling state interest. Parents are legally responsible for their minor children's health insofar as it is in their power to foster it. They have a duty to stay alert to their minor children's medical needs, and to secure appropriate medical assistance if they are able to do so.
When the disabilities of nonage disappear, of course, these paternalistic responsibilities disappear along with them. But until a child is emancipated, she depends on her parent(s) or guardian, legally if not always as a practical matter, to arrange for her heath care, including medical treatment necessitated by post-abortion complications.
North Florida, 852 So.2d at 262 (citations omitted). The district court concluded that the Act is constitutional, reversed the trial court's judgment, and remanded for dissolution of the permanent injunction.

II

A
As we did in T.W., we first consider the source and nature of the right of privacy asserted by petitioners. The text of the Florida Constitution begins with the Declaration of Rights, a series of rights that were created to protect each Floridian from government encroachment in his or her life:
The text of our Florida Constitution begins with a Declaration of Rightsa series of rights so basic that the framers of our Constitution accorded them a place of special privilege. These rights embrace a broad spectrum of enumerated and implied liberties that conjoin to form a single overarching freedom: They protect each individual within our borders from the unjust encroachment *619 of state authorityfrom whatever official sourceinto his or her life. Each right is, in fact, a distinct freedom guaranteed to each Floridian against government intrusion. Each right operates in favor of the individual, against government....
It is significant that our Constitution thus commences by specifying those things which the state government must not do, before specifying certain things that it may do. These Declarations of Rights ... say to arbitrary and autocratic power, from whatever official quarter it may advance to invade these vital rights ... "Thus far shalt thou come, but no farther."

State ex rel. Davis v. City of Stuart, 97 Fla. 69, 102-03, 120 So. 335, 347 (1929). No other broad formulation of legal principles, whether state or federal, provides more protection from government overreaching ... than does this "stalwart set of basic principles."
Traylor v. State, 596 So.2d 957, 963 (Fla. 1992).
Florida voters by general election in 1980 amended the Declaration of Rights to include an express, freestanding Right of Privacy Clause (the "Clause"):
Section 23. Right of privacy.Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
Art. I, § 23, Fla. Const. By amending the constitution to contain this Clause, the electors opted to create a broader, more protective right than that which had existed theretofore:
[The Florida privacy] amendment embraces more privacy interests, and extends more protection to the individual in those interests, than does the federal Constitution.
In re T.W., 551 So.2d at 1192. The Right of Privacy Clause has been implicated in a wide range of matters dealing with personal privacy.[6]

*620 B
The seminal Florida case in this area is In re T.W., 551 So.2d 1186 (Fla.1989), wherein this Court held that section 390.001(4)(a), Florida Statutes (Supp.1988), i.e., the Parental Consent for Abortion Act (the "Parental Consent Act" or the "Act"), violated the Right of Privacy Clause. The Act operated as follows:
Prior to undergoing an abortion, a minor must obtain parental consent or, alternatively, must convince a court that she is sufficiently mature to make the decision herself or that, if she is immature, the abortion nevertheless is in her best interests.
In re T.W., 551 So.2d at 1188-89.
The Court in T.W. relied on an earlier decision of this Court that explained the significance of Florida's Right of Privacy Clause:
This Court in [Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985),] described the far-reaching impact of the Florida amendment:
The citizens of Florida opted for more protection from governmental intrusion when they approved article I, section 23, of the Florida Constitution. This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy. Article I, section 23, was intentionally phrased in strong terms. The drafters of the amendment rejected the use of the words "unreasonable" or "unwarranted" before the phrase "governmental intrusion" in order to make the privacy right as strong as possible. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right to privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.

Winfield, 477 So.2d at 548.
In re T.W., 551 So.2d at 1191-92.
The Court in T.W. then articulated the proper standard for courts to apply in determining whether a legislative enactment impermissibly infringes on the right of privacy:
The privacy section contains no express standard of review for evaluating the lawfulness of a government intrusion into one's private life, and this Court when called upon, adopted the following standard:
Since the privacy section as adopted contains no textual standard of review, it is important for us to identify an explicit standard to be applied in order to give proper force and effect to the amendment. The right of privacy is a fundamental right which we believe demands the compelling state interest standard. This test shifts the burden of proof to the state to justify an intrusion on privacy. The burden can be met by demonstrating that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means.

Winfield, 477 So.2d at 547. When this standard was applied in disclosural cases, government intrusion generally was upheld as sufficiently compelling to overcome the individual's right to privacy. We reaffirm, however that this it is a highly stringent standard, emphasized by the fact that no government intrusion *621 in the personal decisionmaking cases ... has survived.
In re T.W., 551 So.2d at 1192.
The Court determined that a woman has a reasonable expectation of privacy in deciding whether to continue her pregnancy, more so than in virtually any other decision, and that the right of privacy is implicated in the decision. Significantly, the Court held that both the expectation and right apply to pregnant minors:
Florida's privacy provision is clearly implicated in a woman's decision of whether or not to continue her pregnancy. We can conceive of few more personal or private decisions concerning one's body that one can make in the course of a lifetime, except perhaps the decision of the terminally ill in their choice of whether to discontinue necessary medical treatment.
Of all decisions a person makes about his or her body, the most profound and intimate relate to two sets of ultimate questions: first, whether, when, and how one's body is to become the vehicle for another human being's creation; second, when and howthis time there is no question of "whether"one's body is to terminate its organic life.
L. Tribe, American Constitutional Law 1337-38 (2d ed.1988). The decision whether to obtain an abortion is fraught with specific physical, psychological, and economic implications of a uniquely personal nature for each woman. The Florida Constitution embodies the principle that "[f]ew decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision ... whether to end her pregnancy. A woman's right to make that choice freely is fundamental." Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 2185, 90 L.Ed.2d 779 (1986).
The next question to be addressed is whether this freedom of choice concerning abortion extends to minors. We conclude that it does, based on the unambiguous language of the amendment: The right of privacy extends to "[e]very natural person." Minors are natural persons in the eyes of the law and "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults... possess constitutional rights."
In re T.W., 551 So.2d at 1192-93 (citations omitted).
The Court ultimately held that (a) if a legislative act imposes a significant restriction on a woman's (or minor's) right to seek an abortion, the act must further a compelling State interest through the least intrusive means; (b) the Parental Consent Act imposed a significant restriction on a minor's right to seek an abortion; and (c) in light of the Legislature's less restrictive treatment of minors in other comparable procedures and practices, the Act failed to "further" a compelling State interest:
The challenged statute fails because it intrudes upon the privacy of the pregnant minor from conception to birth. Such a substantial invasion of a pregnant female's privacy by the state for the full term of the pregnancy is not necessary for the preservation of maternal health or the potentiality of life. However, where parental rights over a minor child are concerned, society has recognized additional state interests protection of the immature minor and preservation of the family unit. For reasons set out below, we find that neither of these interests is sufficiently compelling under Florida law to override Florida's privacy amendment.

*622 . . . .
We agree that the state's interests in protecting minors and in preserving family unity are worthy objectives. Unlike the federal Constitution, however, which allows intrusion based on a significant state interest, the Florida Constitution requires a compelling state interest in all cases where the right to privacy is implicated. We note that Florida does not recognize these two interests as being sufficiently compelling to justify a parental consent requirement where procedures other than abortion are concerned. Section 743.065, Florida Statutes (1987), provides:
743.065 Unwed pregnant minor or minor mother; consent to medical services for minor or minor's child valid.
(1) An unwed pregnant minor may consent to the performance of medical or surgical care or services relating to her pregnancy by a hospital or clinic or by a physician ... and such consent is valid and binding as if she had achieved her majority.
(2) An unwed minor mother may consent to the performance of medical or surgical care or services for her child by a hospital or clinic or by a physician ... and such consent is valid and binding as if she had achieved her majority.
(3) Nothing in this act shall affect the provisions of s. 390.001 [the abortion statute].
Under this statute, a minor may consent, without parental approval, to any medical procedure involving her pregnancy or her existing childno matter how dire the possible consequences except abortion. Under In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984) (parents permitted to authorize removal of life support system from infant in permanent coma), this could include authority in certain circumstances to order life support discontinued for a comatose child. In light of this wide authority that the state grants an unwed minor to make life-or-death decisions concerning herself or an existing child without parental consent, we are unable to discern a special compelling interest on the part of the state under Florida law in protecting the minor only where abortion is concerned. We fail to see the qualitative difference in terms of impact on the well-being of the minor between allowing the life of an existing child to come to an end and terminating a pregnancy, or between undergoing a highly dangerous medical procedure on oneself and undergoing a far less dangerous procedure to end one's pregnancy. If any qualitative difference exists, it certainly is insufficient in terms of state interest. Although the state does have an interest in protecting minors, "the selective approach employed by the legislature evidences the limited nature of the ... interest being furthered by these provisions." Ivey v. Bacardi Imports Co., 541 So.2d 1129, 1139 (Fla.1989). We note that the state's adoption act similarly contains no requirement that a minor obtain parental consent prior to placing a child up for adoption, even though this decision clearly is fraught with intense emotional and societal consequences.
In re T.W., 551 So.2d at 1194-95 (citations and footnote omitted).

III
As noted above, the Parental Notice Act basically provides that, prior to undergoing an abortion, a minor must notify a parent of her decision or, alternatively, must convince a court that she is sufficiently mature to make the decision herself, or that, *623 if she is immature, the abortion nevertheless is in her best interests. The Act originated in the Florida Legislature as Senate Bill 1598. Upon introduction to the Senate, the bill was referred to the Senate Health, Aging and Long-Term Care Committee, which evaluated the bill and prepared a staff analysis and economic impact statement.[7]
The staff analysis and economic impact statement warned that the bill may run afoul of both the privacy provision of the Florida Constitution and this Court's decision in T.W.:
Both the notification requirements and the imposition of a 48-hour waiting period between the time the parent or guardian is notified and the time the minor may terminate her pregnancy may be considered by the courts as a violation of a minor's state constitutional right to privacy. If the provisions in this bill did become subject to interpretation of the court, any state interest would have to pass a compelling state interest standard due to the express privacy provision in the Florida Constitution. It appears that two of the state interests the bill is designed to protect are the protection of the immature minor and preservation of the family unit. In the case of In re T.W., the Florida Supreme Court found "that neither of these interests is sufficiently compelling under Florida law to override Florida's privacy amendment."
Fla. S. Comm. on Health, Aging and Long-Term Care, SB1598 (1999), Staff Analysis 8 (revised April 6, 1999) (emphasis added) (available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
This warning of constitutional infirmity notwithstanding, the committee nevertheless reported the bill favorably.[8] The bill then was referred to the Senate Judiciary Committee, which prepared a second staff analysis and economic impact statement.[9] When issued, that statement contained a virtually identical warning concerning the Act's constitutional invalidity.[10] The Judiciary Committee nevertheless also reported the bill favorably,[11] and subsequently *624 both the Senate and House of Representatives passed the bill.[12] The bill was enacted as chapter 99-322, section 1, Laws of Florida, and was codified in section 390.01115, Florida Statutes (1999).[13]

*625 IV

A
When reviewing the validity of a legislative enactment, Florida courts generally will apply one of three levels of scrutiny: (1) "ordinary" scrutiny;[14] (2) "mid-level" scrutiny;[15] or (3) "strict" scrutiny.[16] Each level has a concomitant presumption of validity or invalidity and standard of proof.[17] Under "ordinary" scrutiny, which applies to most legislation, an act is presumptively constitutional unless proved otherwise by the challenging party:
It should be kept in mind that in the absence of an impingement upon constitutional rights ... an act of the legislature *626 is presumed to be constitutional. The burden is on the challenger to demonstrate that the law does not bear a reasonable relationship to a proper state objective.
State v. Bussey, 463 So.2d 1141, 1144 (Fla. 1985).[18] On the other hand, under "strict" scrutiny, which applies to legislation impinging on certain fundamental rights, just the opposite is the case. The act is presumptively unconstitutional unless proved valid by the State:
It is well settled that ... if a law "impinges upon a fundamental right explicitly or implicitly secured by the Constitution [it] is presumptively unconstitutional."
Harris v. McRae, 448 U.S. 297, 312, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (quoting City of Mobile v. Bolden, 466 U.S. 55, 76, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980)).[19]
The Court in Chiles v. State Employees Attorneys Guild, 734 So.2d 1030 (Fla.1999), explained that Florida's right of privacy is a fundamental right warranting "strict" scrutiny. A legislative act impinging on this right is presumptively unconstitutional unless proved valid by the State:
The right of privacy is a fundamental right which we believe demands the compelling state interest standard. This test shifts the burden of proof to the state to justify an intrusion on privacy.
Id. at 1033 (quoting Winfield v. Div. of Pari-Mutuel Wagering, 477 So.2d 544, 547 (Fla.1985)). This is the settled law that we applied in T.W. and that we again apply today.

B
An appellate court's first obligation when reviewing a lower court's decision is to articulate its standard of reviewi.e., its criterion for assessing the validity of the lower court's ruling.[20] This requirement serves two functions: it informs the parties of the extent of the review and, most important, reminds the appellate court of the limitations placed on its own authority by the appellate process. The Court in Chiles articulated a prime limitation placed on the appellate court:
The findings of a trial court are presumptively correct and must stand unless [they are unsupported by the record.]
Id. at 1034 (quoting Chiles v. State Employees Attorneys Guild, 714 So.2d 502, 506 (Fla. 1st DCA 1998)). Application of the wrong standard of review may tilt the appellate playing field and irreparably prejudice a party's rights.
To assist appellate courts in evaluating a trial court's ruling concerning the constitutionality of a statute, it oftentimes is preferable to have a record developed in the lower court before a finder of fact.[21] A trial court's ruling concerning the constitutionality of a statute following a trial wherein the parties introduce conflicting evidence is generally a mixed question of law and fact.[22] We conclude that the proper standard of review in such cases is as follows: the trial court's ultimate ruling must be subjected to de novo *627 review,[23] but the court's factual findings must be sustained if supported by legally sufficient evidence.[24] Legally sufficient evidence is tantamount to competent substantial evidence.[25]

C
The State contends that courts, when addressing the constitutionality of a legislative act, must accede to the Legislature's statements of policy and fact:
Whatever this Court's power to act here, this is a social policy issue more appropriately left to the Legislature, which has the ability to hold public hearings and debates, to examine the issue, and to draft appropriate legislation addressing the rights and balancing the interests of the various parties involved which is precisely what the Legislature did in this case.
The State claims that, under the separation of powers doctrine,[26] courts cannot circumvent the "fact-finding prerogative of the Legislature" by giving their own factual findings precedence over legislative statements of policy and fact. We disagree.
While courts may defer to legislative statements of policy and fact, courts may do so only when those statements are based on actual findings of fact, and even then courts must conduct their own inquiry:
The general rule is that findings of fact made by the legislature are presumptively correct. However, it is well-recognized that the findings of fact made by the legislature must actually be findings of fact. They are not entitled to the presumption of correctness if they are nothing more than recitations amounting only to conclusions and they are always subject to judicial inquiry.
Moore v. Thompson, 126 So.2d 543, 549 (Fla.1960) (quoting Seagram-Distillers Corp. v. Ben Greene, Inc., 54 So.2d 235, 236 (Fla.1951)).
In point of fact, this Court in Chiles applied the above rule of law to hold unconstitutional a statute barring collective bargaining by government attorneys. The Court consistently deferred to the trial court's findings and overrode the views of the Legislature:
The trial court examined the statute independently to ascertain whether the committee staff's views, which reflect the state's position, were borne out. To that end, the trial court took evidence on whether section 447.203(3)(j) serves a compelling state interest and whether it does so by means least burdening state employees' rights to bargain collectively. The lower court found [that the State's interest in maintaining the lawyer-client relationship was compelling but that section 447.203(3)(j) was not the least intrusive means of serving that interest]....
. . . .
... We have been shown no basis for disturbing the trial court's findings of fact in this regard.
Id. at 1034-35 (quoting Chiles v. State Employees Attorneys Guild, 714 So.2d *628 502, 506 (Fla. 1st DCA 1998)). In sum, legislative statements of policy and fact do not "obviate the need for judicial scrutiny."[27] The soundness of this rule is borne out in the present case.

V
Although the official record of Senate Bill 1598 is scant (it comprises only a few documents and audio tapes), that record shows the following. After the bill was introduced to the Senate, it was submitted in preliminary form by its sponsor to the Senate bill drafting service.[28] The bill that emerged from the drafting service included a preamble that contained numerous "whereas" clauses, each of which was a statement of fact or purpose.[29] None of *629 those clauses were designated as findings of fact. Nor could they properly be so designated in light of the fact that the drafting service has neither the authority nor the means for gathering and evaluating evidence and making factual determinations.[30]
After the bill emerged from the drafting service, it was filed with the Secretary of the Senate and then was referred by the President of the Senate to the two committees noted above. Neither committee was charged with fact-finding, and neither committee made a formal effort to gather evidence and render findings of fact. Instead, each conducted a brief public hearing.[31] Because of the committees' time constraints, only two witnesses for each side were allowed to testify at the first hearing[32] and three witnesses for each side at the second hearing.[33] The witnesses included one registered lobbyist, six individuals affiliated with special interest groups, and one lay person.[34]
The total time allotted for direct testimony (for all witnesses combined) was limited to fifteen minutes at the first hearing, and five minutes at the second hearing.[35] *630 The testimony was pro forma; none of the witnesses were sworn, and none were subjected to formal cross-examination.[36] In fact, only one witness was questioned by committee members.[37] Several of the witnesses testified for less than sixty seconds each.[38] Immediately after the witnesses testified at each hearing, the bill was debated and reported favorably by the committee.[39] When the bill was referred from the second committee to the full Senate and then delivered to the House of Representatives, neither of those bodies conducted any fact-finding; the proceedings in each chamber were limited to the floor debate, reading of the bill, and voting.[40] The voting immediately followed the floor debate and reading of the bill.[41]
In contrast, the certified record of the trial court below is extensiveit fills four large file boxes and comprises thousands of pages of transcript and exhibitsand shows the following. The court conducted a two-and-one-half day evidentiary hearing and a five-day bench trial wherein numerous witnesses testified at length, often for hours at a time. The witnesses were experts in their fields: each had extensive educational credentials, professional affiliations and certifications, and experience. All the witnesses were sworn, and all were subjected to the crucible of cross-examination. The parties also submitted voluminous documents, depositions, and other exhibits. All the proceedings comported with the legal requirements of the Florida Rules of Civil Procedure, and all evidence met the formal requirements of the Florida Evidence Code.[42]
After trial, the matter rested in the sound judgment of the trial court. The court assessed the credibility of the competing witnesses, weighed the conflicting evidence, studied the applicable law, deliberated on the matter, and then issued a detailed eighteen-page written order. Although the court, in its written order, paid due recognition to the Legislature's statements of fact and purpose, the court properly did not accede to those statements but rather framed the legal issues itself, made its own factual findings, conducted its own analysis, and reached its own conclusions.

*631 VI

A
Applying the above rules of law to the present case, we first must determine whether the district court, in conducting its review of the trial court's ruling, erred in a manner that adversely affected its decision. As noted above, the district court articulated numerous factual findings, which it derived from the record. Our own review of the record, however, shows that none of those findings were made by the trier-of-fact. Rather, the district court's findings in many instances are contradicted by the trial court's findings on the same point.
Significantly, the district court's ultimate determinationthat the Act furthers a compelling State interest because it allows parents to assist in giving post-abortion care to a minoris controverted by the findings of the trial court. The trial court found inter alia that, while such parental support is certainly preferable, "most minors, especially older minors, are perfectly capable of following directions for aftercare treatment." By ignoring the trial court's findings, the district court violated the basic precept of appellate review articulated in Chiles: "The findings of a trial court are presumptively correct and must stand unless [they are unsupported by the record]."[43] Accordingly, we quash the district court's decision.

B
In evaluating the present trial court's decision, we review the court's ultimate ruling de novo, but we defer to the court's factual findings if they are supported by competent substantial evidence in the record. In particular, we focus on two key questions addressed by the court. (1) Does the Parental Notice Act impose a significant restriction on a minor's right of privacy? And if so, (2) does the Act further a compelling State interest through the least intrusive means?

1
As to whether the Parental Notice Act imposes a significant restriction on a minor's right of privacy, the trial court addressed this matter as follows:
The State argues, alternatively, that the Parental Notification Statute is essentially different in character and effect than a Parental Consent Statute, such as was struck down in T.W. After all, the minor is still free to choose an abortion. There is no veto power by the parent over the minor's decision. Thus, the State argues, the Act is an insignificant intrusion on a woman's right of privacy and should be permissible. The State cites federal case authority in support of this argument. I am unpersuaded.
. . . .
[T]he argument that a statute requiring notice to parents is not a significant intrusion on a minor's right of privacy ignores the realities of the intended and expected effect of the Act. While the requirement of notification is certainly less restrictive than the requirement of parental consent, it is by no means insignificant. The stated, obvious, and intended purpose of the law is to allow the parents an opportunity to exert parental authority and influence over their child, to provide care, comfort and guidance. And, the ability of parents, for better or worse, to persuade, influence, coerce, intimidate, and otherwise affect the decisions and conduct of their children is tremendous. Further, what parent would not do all he or she could; including *632 seeking relief in court, to prevent their child from doing something they felt was not in her best interest.
Even under the best of conditions, there will be some delay and thus increased risk to the minor child in having the abortion performed. Having to speak to a guardian ad litem and/or attorney, coming up before a judge and other court personnel can be embarrassing and intimidating. The chance of a breach in the confidentiality requirement is a real possibility, especially in small communities. Some minors, fearful that a judge will deny their petition, or that their parents will find out anyway, will delay their decision long enough that termination of the pregnancy will no longer be an option. Some children, without doubt, will seek at all cost to avoid telling their parents, including going to other states, having illegal abortions, or self-inducing abortions. Some physicians, unsure of their potential for liability, will be more cautious and less likely to perform an abortion for a minor if there is any question as to proper notification.
I would also suggest that the parental consent and the parental notification statutes are very similar in their intended and expected effect. In both situations, it would be expected that the good parentthe one who would use their parental influence to care, comfort, guide, and assist the minor in her decision, is likely, as the state asserts, to ultimately support their child in whatever decision they make. It is unlikely that that parent will exercise a "veto power" if they have it, if their child decides to terminate the pregnancy. In fact, many parents will lobby in favor of their young daughter having the abortion rather than carrying to term.
Moreover, under both types of statute, the criteria for obtaining a bypass is essentially the same, i.e., establish that she is sufficiently mature to make her own decision, or for some reason, it is not in her best interest to notify the parent or to get the parent's consent. In both cases, the same group of minors would theoretically be able to bypass either the requirement of notification or consent. And, if the experience of other states with such statutes is any indication, very few petitions would be turned down under either statute. Based on the above, I cannot say that the effect of this legislation on a minor's ability to freely choose is so insignificant that the compelling state interest standard is not implicated.
Our review of the record shows that the trial court's ruling on this point must be sustained. First, the court's main findingthat the notification requirement is similar to the consent requirement in that it constitutes a significant intrusion on a minor's right of privacyis supported by competent substantial evidence in the record. As noted above, few decisions are more private and properly protected from government intrusion than a woman's decision whether to continue her pregnancy,[44] and yet the Act's notification requirement prohibits a pregnant minor from keeping this matter private. And second, the court's ultimate conclusionthat the Act can meet constitutional muster only if it furthers a compelling State interest through the least restrictive meanscomports with the applicable law as articulated in T.W. and other decisions of this Court.

2
As to whether the Parental Notice Act furthers a compelling State interest, the trial court addressed this matter thusly:

*633 5. The State may be able to establish a compelling state interest justifying intrusion upon a minor's right of privacy that would not justify the intrusion into the privacy interest of an adult.
. . . .
7. The State's interests in protecting an immature minor and fostering the integrity of the family, while important and worthy, do not justify restricting a minor's right to choose abortion where similar restrictions are not imposed on comparable choices or decisions.
. . . .
One of the key holdings of T.W. as it pertains to the present case, is Number 7. You can't say that our interest in protecting immature minors and preserving family unity is so compelling that it justifies interfering with a minor's choice to have an abortion, where those interests are not deemed sufficiently compelling to justify interference with comparable decisions. It is not enough for the state to say that an interest is compelling. It must be demonstrated through comprehensive and consistent legislative treatment.
In support of this last point, the court cited section 743.065, Florida Statutes (1999), which was the same statutory section we relied on in T.W. The trial court then quoted the following passage from T.W.:
Under [section 743.065], a minor may consent, without parental approval, to any medical procedure involving her pregnancy or her existing childno matter how dire the possible consequencesexcept abortion. Under In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984) (parents permitted to authorize removal of life support system from infant in permanent coma), this could include authority in certain circumstances to order life support discontinued for a comatose child. In light of this wide authority that the state grants an unwed minor to make life-or-death decisions concerning herself or an existing child without parental consent, we are unable to discern a special compelling interest on the part of the state under Florida law in protecting the minor only where abortion is concerned. We fail to see the qualitative difference in terms of impact on the well-being of the minor between allowing the life of an existing child to come to an end and terminating a pregnancy, or between undergoing a highly dangerous medical procedure on oneself and undergoing a far less dangerous procedure to end one's pregnancy. If any qualitative difference exists, it certainly is insufficient in terms of state interest.
T.W., 551 So.2d at 1195 (footnote omitted).
Critical to the trial court's decisionand to our decision todayis the fact that nothing whatsoever has changed in this statutory scheme since T.W. was decided. The trial court explained:
The contrast between the Legislature's treatment of a minor's decision to choose an abortion and its treatment of comparable decisions by a minor is as stark today as it was when the Florida Supreme Court issued its decision in T.W. Section 743.065, Florida Statutes, continues to allow an unwed pregnant minor to consent to dangerous medical procedures for herself and for her child without any involvement of the minor's parent. A minor may still give a child up for adoption without any involvement of the minor's parent or legal guardian. Physicians, health care professionals, and health facilities "may examine and provide treatment for sexually transmitted diseases to any minor" without any parental involvement, and a minor aged 13 or over may obtain mental health *634 diagnostic and evaluative services and outpatient crisis intervention services without parental involvement. In addition, a minor may obtain contraceptives and pregnancy tests from health care providers without any requirement that a parent be notified.
The court applied the above legal principles to its findings and rejected out of hand the State's "abortion is different" argument:
As noted above, the health risk to a minor who becomes pregnant and carries the child to term are just as great, or greater, than the risk of having an abortion. All of the expressed state interests sought to be furthered by this Act, are equally applicable, and equally important, to all of these other similar decisions. A minor is no more mature, or better able to make informed decisions as to carrying a child to term, or determining medical treatment for her child, or giving her child up for adoption. The desirability of parental involvement is no less in these situations than when a minor is considering abortion. Yet, the state does not require notice to parents in any of these other situations.
Again, our review of the record shows that the trial court's findings on this point are supported by competent substantial evidence and its ultimate conclusion comports with the applicable law.

VII

A
The State claims that, despite the ruling of the trial court below, we should find the Parental Notice Act constitutional because the United States Supreme Court has approved similar parental notification statutes under the federal constitution.[45] Further, the State relies on the United States Supreme Court decision in Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), wherein a plurality of the Court abandoned the "strict" scrutiny standard in favor of the less stringent "undue burden" standard.[46] The State urges this Court to recede from T.W. and adopt the same "undue burden" standard in Florida. We decline to do so.
First, any comparison between the federal and Florida rights of privacy is inapposite in light of the fact that there is no express federal right of privacy clause.[47] Florida is one of only a handful of states wherein the state constitution includes an independent, freestanding Right of Privacy Clause.[48] Unlike the citizens of Florida, the citizens of the United States have never amended the national charter to include a freestanding privacy clause. While the United States Supreme Court has read into the federal constitution an implicit right of privacy,[49] that particular right is a weak version of our explicit freestanding state right. As noted above:
[The Florida privacy] amendment embraces more privacy interests, and extends *635 more protection to the individual in those interests, than does the federal Constitution.
In re T.W., 551 So.2d at 1192. Further, the United States Supreme Court, time and again, has made it clear that the individual states, not the federal government, are the ultimate guarantors of personal privacy:
But the protection of a person's general right to privacyhis right to be let alone by other peopleis, like the protection of his property and of his very life, left largely to the law of the individual States.
Katz v. United States, 389 U.S. 347, 350-51, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnotes and emphasis omitted).
And second, it is settled in Florida that each of the personal liberties enumerated in the Declaration of Rights is a fundamental right.[50] Legislation intruding on a fundamental right is presumptively invalid[51] and, where the right of privacy is concerned, must meet the "strict" scrutiny standard.[52] Florida courts consistently have applied the "strict" scrutiny standard whenever the Right of Privacy Clause was implicated, regardless of the nature of the activity.[53] The "undue burden" standard, on the other hand, is an inherently ambiguous standard and has no basis in Florida's Right of Privacy Clause.
In order to adopt the "undue burden" standard, as the State urges, we would have to abandon an extensive body of clear and settled Florida precedent in favor of an ambiguous federal standard. Most important, *636 however, we would have to forsake the will of the people. If Floridians had been satisfied with the degree of protection afforded by the federal right of privacy, they never would have adopted their own freestanding Right of Privacy Clause. In adopting the privacy amendment, Floridians deliberately opted for substantially more protection than the federal charter provides.

B
The State next alleges that our decision in T.W. has no precedential value because there was no "majority opinion" in that case. The State points to the following language in Justice Kogan's concurring opinion in Jones v. State, 640 So.2d 1084 (Fla.1994):
On another relevant point, I must express some surprise at the rather widespread practice in Florida of referring to a "majority opinion" in T.W. In actuality there was no "majority opinion" at all. The views of the Justices in T.W. were divided into five separate opinions, none of which garnered the four votes necessary to constitute a precedential "opinion" under the Florida Constitution.
Jones, 640 So.2d at 1091 (Kogan, J., concurring). We disagree.
In T.W., Justices Shaw, Barkett, and Kogan "concurred" in the opinion of the Court, which was authored by Justice Shaw; Chief Justice Ehrlich "concurred specially" in that opinion. Chief Justice Ehrlich's opinion speaks for itself, commencing thusly:
I generally concur with the majority opinion and the result it reaches. I write only to express my disagreement with the definition of "viability" adopted by the majority and to elucidate my views.
In re T.W., 551 So.2d at 1197 (Ehrlich, C.J., concurring specially) (emphasis added). Chief Justice Ehrlich's sole point of difference with the majority opinion was this: instead of adopting the definition of "viability" set forth in T.W., he would have preferred to adopt the definition set forth in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). He pointed out, however, that this disparity made no difference in the outcome of T.W. because the pregnancy in that case had not yet reached the point of viability under either definition.
In the final analysis, the opinion in T.W. that was authored by Justice Shaw garnered a total of four votes except for the definition of "viability," upon which Chief Justice Ehrlich disagreed. On that point alone, Justice Shaw's opinion garnered a total of three votes. Thus, in all respects, except for the definition of "viability," Justice Shaw's opinion in T.W. was the "majority opinion" of the Court and is binding precedent.[54] In point of fact, the majority opinion in T.W. subsequently has been relied on extensively by this Court in developing and refining our State privacy jurisprudence.[55] In contrast, the construction *637 of T.W. urged by Justice Kogan was rejected by the entire Court.[56]

C
Finally, the State claims that we should recede from T.W. based on the following grounds:

T.W. is flawed because the Court failed to recognize that there are ... fundamental differences between abortion and prenatal care which justify the Legislature treating those two subjects differently. Additionally, the T.W. Court failed to recognize that the parental consent statute was consistent with our State's historic treatment of children differently than adults. For these reasons, T.W. is flawed and should not be followed.
The State in effect is asking this Court to recede from T.W. because it was wrongly decided. We decline to do so.
The doctrine of stare decisis, or the obligation of a court to abide by its own precedent, is grounded on the need for stability in the law and has been a fundamental tenet of Anglo-American jurisprudence for centuries:
For it is an established rule to abide by former precedents, where the same points come again in litigation; as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion; as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from, according to his private sentiments: he being sworn to determine, not according to his own private judgment, but according to the known laws and customs of the lands; not delegated to pronounce a new law, but to maintain and expound the old one.
1 William Blackstone, Commentaries *69 (emphasis omitted). The doctrine was part of the English common law when the State of Florida was founded and thus was adopted and codified by the Florida Legislature in 1829.[57] The doctrine was memorialized by this Court nearly a century and a half ago[58] and has since been addressed extensively by the Court.[59]
Before overruling a prior decision of this Court, we traditionally have asked several questions, including the following. (1) Has the prior decision proved unworkable due to reliance on an impractical legal "fiction"? (2) Can the rule of law announced in the decision be reversed without serious injustice to those who have relied on it and without serious disruption in the stability of the law? And (3) have the factual premises underlying the decision changed so drastically as to leave the decision's central holding utterly without legal justification? The presumption in favor *638 of stare decisis is strong, and where the decision in issue was a watershed judgment resolving a deeply divisive societal controversy, the presumption in favor of stare decisis is at its zenith.
Applying the above criteria to our decision in T.W., we conclude that T.W. passes muster. First, T.W. in no sense has proved "unworkable" due to reliance on an impractical legal fiction. For purposes of comparison, a classic case wherein a decision of this Court proved unworkable in this regard was Amlotte v. State, 456 So.2d 448 (Fla.1984). There, we relied on several legal fictions to uphold the existence of the criminal offense of attempted felony murder. Those legal fictions, however, subsequently proved too abstruse for courts to maintain and we ultimately receded from that decision.[60] In contrast, our decision in T.W. was not based on any legal fiction and thus has not proved to be unworkable in this regard.
Second, the extent of reliance on T.W. unquestionably has been great. During the past fourteen years, Floridians have organized their personal and family relationships based on the constitutional right articulated in that decision, and a generation of Florida women has matured during that period and has had an opportunity to participate equally in the social and economic life of this State due in part to the ability to make personal decisions based on T.W. Further, T.W. has been relied on by Florida appellate courts more than fifty times and has been utilized extensively by this Court in formulating Florida's privacy jurisprudence.[61] Additionally, T.W. has served as a model in other jurisdictions.[62]
And third, no premise of fact has changed in the intervening years so as to render T.W.'s holding utterly without legal justification. Although federal case law indicates that, due to scientific advancements, there may have been slight changes in (a) the safety of abortions and (b) the point at which a fetus becomes viable,[63] both the former[64] and latter[65] were anticipated in T.W. and were expressly factored into that decision. Further, both those changes are of a technical or evolutionary nature and are not the type of precipitous factual upheaval that would be required in order to render a prior decision of this Court utterly without legal justification.
Based on the foregoing, we decline the State's invitation to recede from T.W. We cannot forsake the doctrine of stare decisis and recede from our own controlling precedent when the only change in this area has been in the membership of this Court. Justice Stewart of the United States Supreme Court addressed this issue over a quarter-century ago:
A basic change in the law upon a ground no firmer than a change in our membership invites the popular misconception that this institution is little different from the two political branches of the Government. No misconception *639 could do more lasting injury to this Court and to the system of law which it is our abiding mission to serve.
Mitchell v. W.T. Grant Co., 416 U.S. 600, 636, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (Stewart, J., dissenting).
We agree that a basic change in Florida law at this point would constitute an unprincipled abrogation of the doctrine of stare decisis and would invite the popular misconception that this Court is subject to the same political influence as the two political branches of government. Nothing could do more lasting injury to the legitimacy of this Court as an institution. It is in issues such as the presentwhere popular sentiments run strong and conflicts deepthat stability in the law is paramount and that the doctrine of stare decisis applies perforce, particularly where a watershed decision of this Court is concerned. Accordingly, we forswear any change in the controlling law in this area absent the most special and extraordinary circumstances.

VIII
We recognize that the legal issue of abortion has been one of the most gut-wrenching, emotionally laden issues of past decades in Florida. As ordinary citizens, our hearts and our respect go out to all the well-intentioned, civic-minded individuals on both sides of the present debate who have worked passionately within the confines of the law to instill in Florida's youth a sense of moral rectitude and accountability, to prevent teenage pregnancies, and to make this State a better, more wholesome place for our youth. The data and vignettes adduced by the advocates for each side are at once thought-provoking, harrowing, and heart-breaking. We do not question the strength or sincerity of the parties' convictions.
Sitting as a Court, however, we cannot be ruled by emotion. Rather, we are sworn to uphold the law of this State and to decide each case deliberately, based solely on the law. Although this obligation to apply the law objectively is at times a difficult undertaking, the alternative is untenable:
Although this legal preceptand indeed the rule of objective, dispassionate law in generalmay sometimes be hard to abide, the alternativea Court ruled by emotionis far worse.
Jones v. State, 705 So.2d 1364, 1367 (Fla. 1998). As with any case that comes before us, we cannot decide the present case based on our own assessment of the weight of the competing moral arguments. Rather, we address a conventional legal issue: Did the trial court err in holding the Act unconstitutional?
In the final analysis, we cannot fault the trial court for faithfully applying the controlling law. The court reasoned simply as follows. (1) This Court in T.W. held that the Parental Consent Act imposed a significant restriction on a pregnant minor's right of privacy. (2) The Court in T.W. further held that, in light of the Legislature's less restrictive treatment of minors in other comparable procedures and practices, the State failed to prove that the Parental Consent Act "furthered" a compelling State interest. (3) In the present case, the Parental Notice Act also imposes a significant restriction on a pregnant minor's right of privacy. (4) In the intervening years since T.W. was decided, there has been no change in the Legislature's treatment of minors in other comparable procedures and practices. Accordingly, (5) the State similarly has failed to prove that the Parental Notice Act "furthers" a compelling State interest.
Based on the foregoing, we reaffirm In re T.W., 551 So.2d 1186 (Fla.1989), and *640 quash State v. North Florida Women's Health & Counseling Services, Inc., 26 Fla. L. Weekly D419 (Fla. 1st DCA 2001). We approve the trial court's decision permanently enjoining enforcement of the Parental Notice Act. We expressly decide this case on state law grounds and cite federal precedent only to the extent that it illuminates Florida law. Again, we note that any comparison between the federal and Florida rights of privacy is inapposite in light of the fact that there is no express federal right of privacy clause. Pursuant to the doctrine of judicial restraint, we decline to address petitioners' remaining constitutional claims because resolution of those claims is unnecessary for the disposition of this case.[66]
It is so ordered.
ANSTEAD, C.J., and PARIENTE and QUINCE, JJ., concur.
ANSTEAD, C.J., concurs specially with an opinion.
PARIENTE, J., concurs specially with an opinion, in which ANSTEAD, C.J., and QUINCE, J., concur.
QUINCE, J., concurs specially with an opinion, in which PARIENTE, J., concurs.
LEWIS, J., concurs in result only with an opinion.
WELLS, J., dissents with an opinion.
ANSTEAD, C.J., specially concurring.
While I agree with much that is said in the separate opinions about the government's distinct interest in a minor's health care, I am compelled to concur in Justice Shaw's majority opinion because it has correctly identified and followed this Court's controlling precedent on the law.
At the core of the majority's holding is that the trial court did not, and this Court cannot, ignore the Court's controlling precedent on the issues involved herein. Indeed, the history of the legislation at issue reflects explicit legislative staff warnings and a prior Governor's veto of the same legislation based on this Court's precedent, and those warnings have been validated by the trial court's judgment and today's holding properly applying our controlling precedent on the issues presented. The trial court's final judgment and today's majority opinion rest soundly and squarely upon this Court's prevailing law.

The Controlling Law and the Trial Court's Judgment
There can be no doubt that the controlling law on this issue is set out in Justice Shaw's opinion for the Court in the case of In re T.W., 551 So.2d 1186 (1989). The Court's opinion there concludes that women, including unwed minors, are vested with the right, under Florida's express constitutional right to privacy, to determine by themselves, and as a private matter, whether to terminate a pregnancy.[67] That is the prevailing law. That same opinion holds that the government cannot *641 intrude upon this fundamental right of privacy unless it can demonstrate a compelling state interest for doing so, and that its proffered legislation serves that interest by a means most narrowly tailored to do so and that is least intrusive on the woman's fundamental right to privacy.[68] That, too, is the prevailing law.
The Court's opinion in In re T.W. found the government's claim to a compelling interest flawed because the government, while asserting a compelling interest in the minor's health, had actually enacted numerous other statutory schemes that placed absolutely no restrictions on the minor's health decisions in instances arguably fraught with far more risks than a termination of pregnancy:
In light of this wide authority that the state grants an unwed minor to make life-or-death decisions concerning herself or an existing child without parental consent, we are unable to discern a special compelling interest on the part of the state under Florida law in protecting the minor only where abortion is concerned.
Id. at 1195. In other words, the Court determined that the government's interest could hardly be described as "compelling" when it was not invoked in these other serious health care situations. The Court's opinion noted that the net effect of the inconsistent statutory schemes appeared to improperly single out the minor's decision to terminate her pregnancy as the only concern of the government.[69] Hence, the Court concluded that by its inconsistency the government had failed to demonstrate a compelling government interest in the minor's decision-making process concerning her health care. The patent inconsistency was found to be fatal to the government's claim.
Because the same inconsistency found controlling in In re T.W. still exists today, the trial court and today's majority opinion simply conclude that the government has again failed to demonstrate a compelling interest in the minor's health care decisions. As Circuit Judge Lewis pointedly explained in the final judgment:
The contrast between the Legislature's treatment of a minor's decision to choose an abortion and its treatment of comparable decisions by a minor is as stark today as it was when the Florida Supreme Court issued its decision in T.W. Section 743.065, Florida Statutes, continues to allow an unwed pregnant minor to consent to dangerous medical procedures for herself and for her child without any involvement of the minor's parent. A minor may still give a child *642 up for adoption without any involvement of the minor's parent or legal guardian. Physicians, health care professionals, and health facilities "may examine and provide treatment for sexually transmitted diseases to any minor" without any parental involvement, and a minor aged 13 or over may obtain mental health diagnostic and evaluative services and outpatient crisis intervention services without parental involvement. In addition, a minor may obtain contraceptives and pregnancy tests from health care providers without any requirement that a parent be notified.
Surely, we cannot fault the trial court for being faithful to this Court's controlling precedent in In re T.W. Of course, we too, are bound to follow that precedent, and, accordingly, approve the trial court's judgment.
In short, this is the controlling law from this Court's precedent in In re T.W. and this is the controlling law that was strictly adhered to by the trial court in its detailed analysis finding that, as in In re T.W., the government had again failed, for the very same reasons discussed in In re T.W., to demonstrate a compelling state interest for interfering with the pregnant minor's explicit right of privacy in deciding whether to terminate her pregnancy.

Least Intrusive Means
The trial court also found the government had failed to meet the second part of the constitutional test set out in In re T.W., for evaluating governmental intrusions on fundamental rights. The trial court concluded that even assuming that the government could demonstrate a compelling interest, it had not devised a scheme in this instance narrowly tailored to serve that interest, and at the same time be the least intrusive on the pregnant minor's right of privacy in making the private and intensely personal decision as to whether to continue or terminate her pregnancy.
The trial court concluded that having to make a choice between being forced to openly disclose both her pregnancy and her decision to terminate, or to file a public lawsuit to avoid such disclosure, left the pregnant minor with a Hobson's choice that openly violated her right to privacy and her choice under that right to keep the decision-making process personal and private.
The trial court actually found that there existed numerous ways in which the government's asserted interests in the pregnant minor's decision could be served in a less intrusive and more narrowly tailored manner than the forced intrusion mandated by the notification statute. In addition, as pointed out in Justice Pariente's concurrence, we know that other states have actually demonstrated that less intrusive schemes exist since those states have enacted less intrusive schemes that serve the same purpose. The very existence of those schemes clearly validates the trial court's conclusion that the scheme enacted here, forcing an open disclosure of the minor's pregnancy and the decision to terminate, or the filing of a lawsuit for waiver of the mandated disclosure, is not the narrowest or "least intrusive means" available to serve the government's asserted interests and still respect the minor's right to privacy. Again, this conclusion by the trial court is predicated upon the constitutional requirements set out in In re T.W.

Dissenting View
While I recognize the good faith of the dissenting view, I conclude that view may be more properly characterized as rejecting controlling precedent and taking issue with this Court's holding in In re T.W. than disputing the trial court's proper application of that holding here. As noted above, In re T.W. is binding precedent and *643 has been properly interpreted and applied by the trial court and by Justice Shaw in the majority opinion. Surely no one can assert that Justice Shaw, who authored the Court's opinion in In re T.W., does not understand the meaning of that opinion, or has misapplied it here. If anyone knows what In re T.W. stands for, it is Justice Shaw. In fact, Justice Shaw is the only member of the present Court who participated in the decision in In re T.W.
Further, while at one level the dissent simply debates Justice Shaw's interpretation of his own prior opinion in In re T.W., the dissent also takes a far more drastic view. That view would have this Court not only recede from In re T.W. and our numerous decisions that have relied on its analysis and holding, but also would have us recede from the long established constitutional principles that were applied in In re T.W. and have been applied in the majority opinion today. Such action would wreak havoc with our law.
This dissent, for example, would abandon the well established constitutional law principle consistently adhered to by this Court that the ordinary deference due legislation does not apply when a fundamental constitutional right, such as Florida's right to privacy, is implicated. In fact, the dissenter has himself endorsed that principle, and was the author of our most recent opinion applying that principle in Chiles v. State Employees Attorneys Guild, 734 So.2d 1030 (Fla.1999). The established constitutional principles set out in the Chiles opinion have been utilized by the majority opinion again today as a roadmap for evaluation of the constitutional issues we have resolved.
As explained in Chiles, under our long-established principles of constitutional adjudication, not only does the rule of deference not apply in fundamental rights cases, but the burden rests in such cases with the government to demonstrate a compelling state interest advanced by the least intrusive means sufficient to overcome the constitutional right. In addition, where the government's burden to demonstrate the existence of a compelling state interest or the use of least intrusive means turns on determinations of fact, the "findings of a trial court are presumptively correct and must stand unless clearly erroneous." Chiles, 734 So.2d at 1034. Of course, no one has even asserted that the trial court's findings here are "clearly erroneous," or has otherwise demonstrated that the trial court erred in its application of this Court's law concerning governmental intrusions on fundamental rights.

REMEDY FOR GOVERNMENT
While I have no doubt as to the soundness of the trial court's judgment and today's decision approving that judgment, I, nevertheless, recognize that the government has a distinct interest in the health and welfare of its children that is different in kind than the government's similar interest in the health and well being of adults. As noted above, this Court's decision in In re T.W. relied on the government's failure to consistently recognize that interest, and, in fact, to selectively target only the health care decision to terminate a pregnancy, as the reason for concluding the government had failed to make a case that its interest was compelling. However, under this Court's holding in In re T.W., and our holding today, the government still has the option available to remedy the problem this Court found fatal to the legislative scheme identified in In re T.W.[70]
*644 It is important to note, as legislative staff once did, that this Court's opinion in In re T.W. also put the government on explicit notice of how the inconsistency that was fatal to a claim of a "compelling" interest could be remedied. In In re T.W. this Court explicitly identified legislative inconsistency as an obstacle to the enactment of the legislation at issue. However, in this instance, and without removing the obvious legal obstacle expressly pointed out by Justice Shaw in In re T.W., the government went ahead over staff warnings and enacted the legislation under review. The obstacle of "inconsistency" was clearly within the power of the government to remedy before enacting the current legislation. To be sure, the government can avoid these problems by bringing more consistency to the legislative provisions concerning a minor's health choices, and by making parental involvement the norm rather than the exception to a minor's important health care choices.[71]
In short, under this Court's controlling precedent in In re T.W, the government is still left with the ability to both demonstrate its valid and consistent interests in a minor's health and well being, and to do so in a manner less intrusive than the present selective and directly intrusive scheme on the minor's right of privacy. In the meantime, however, this Court is bound to honor its own precedent, and Justice Shaw's opinion does so today.
PARIENTE, J., specially concurring.
I fully concur with the majority opinion, and agree that this case is controlled by the majority opinion in In re T.W., 551 So.2d 1186 (Fla.1989). I write separately to emphasize that it is not T.W. alone that renders the parental notification law unconstitutional, but also the well-established precedent governing review of legislation that infringes on fundamental rights in general and Florida's constitutional right of privacy in particular. I also write separately to specifically respond to the arguments advanced by the dissent and the concerns expressed by Justice Lewis in his concurring in result only opinion. Simply put, the State has not met its heavy burden of establishing that mandating parental notification of the minor's abortion decision furthers any compelling state interest. Specifically, the State has failed to establish that parental notification makes abortion a safer procedure for minors. Rather, parental notification, like the parental consent law held unconstitutional in T.W., impermissibly infringes on a minor's constitutional right of privacy guaranteed by the Florida Constitution.
Our decision today rests on the firm foundation of this Court's precedent that guides the adjudication of challenges to statutes infringing on fundamental rights, including the right of privacy contained in article I, section 23 of the Florida Constitution. *645 In every case since Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla.1985), we have held that legislation that infringes on the right of privacyas this statute doesis unconstitutional unless the State has proved that the legislation serves a compelling state interest; that the legislation substantially furthers that interest; and that the legislation does so through the least restrictive means. Known as "strict scrutiny analysis," this standard is the most stringent this Court applies, and imposes the heaviest burden of proof for the State to sustain.
As the New Jersey Supreme Court stated when it declared that state's parental notification statute unconstitutional:

We acknowledge that the State has a substantial interest in preserving the family and protecting the rights of parents. When weighed against the right of a young woman to make the most personal and intimate decision whether to carry a child to term, however, the insubstantial connection between the notification requirement and the interests expressed by the State is not sufficient to sustain the statute. We emphasize that our decision in no way interferes with parents' protected interests, nor does it prevent pregnant minors or their physicians from notifying parents about a young woman's choice to terminate her pregnancy. Simply, the effect of declaring the notification statute unconstitutional is to maintain the State's neutrality in respect of a minor's childbearing decisions and a parent's interest in those decisions. In effect, the State may not affirmatively tip the scale against the right to choose an abortion absent compelling reasons to do so.

Planned Parenthood of Central New Jersey v. Farmer, 165 N.J. 609, 762 A.2d 620, 622 (2000) (emphasis supplied). I agree with the New Jersey Supreme Court's reasoning and find its analysis to be applicable to our evaluation of the constitutionality of Florida's similar parental notification statute. In my view, in light of our precedent in this area of law and the extensive factual record and findings developed in the trial court below, the State has not met its heavy burden in this case.

ANALYSIS

A. STRICT SCRUTINY STANDARD OF PROOF AND STANDARD OF REVIEW
Contrary to Justice Wells' characterization of the discussion of the standards of review as "irrelevant," dissenting op. at 668, I conclude that the determination of the proper standard of review is highly relevant to our analysis on this issue. Indeed, by failing to acknowledge that this Court's deference to legislative policy is determined by the applicable standard of review, Justice Wells largely ignores well-settled principles of law.
It is the rational basis test that insulates legislative action on most public policy decisions from interference by the courts. "This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); see also Lane v. Chiles, 698 So.2d 260, 262 (Fla.1997) ("Generally, a state statute must be upheld ... if there is any reasonable relationship between the act and the furtherance of a valid governmental objective.").
Further, consistent with the deferential standard, courts apply to rational basis review the rule of statutory construction that accords legislation a presumption of *646 validity. See Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); Caple v. Tuttle's Design-Build, Inc., 753 So.2d 49, 51 (Fla.2000). Until the presumption is overcome, the state has no burden of persuasion and "no obligation to produce evidence to sustain the rationality of a statutory classification." Heller, 509 U.S. at 320, 113 S.Ct. 2637. If there is "any reasonably conceivable state of facts that would provide a rational basis for the classification," the courts must defer to the Legislature. Id.[72]
However, this case does not involve a rational basis standard of review because in this case the statute implicates a fundamental constitutional right. When a statute burdens a suspect classification[73] or a fundamental right, the statute is subject to strict scrutiny. See Westerheide v. State, 831 So.2d 93, 110 (Fla.2002). Unlike rational basis review or the intermediate level of scrutiny, the strict scrutiny standard "imposes a heavy burden of justification upon the state to show an important societal need and the use of the least intrusive means to achieve that goal." Chiles v. State Employees Attorneys Guild, 734 So.2d 1030, 1033 (Fla.1999) (quoting Florida Bd. of Bar Examiners Re: Applicant, 443 So.2d 71, 74 (Fla.1983)); see also Florida High School Activities Ass'n. v. Thomas, 434 So.2d 306, 308 (Fla.1983) (stating that the strict scrutiny is a "harsh standard [which] imposes a heavy burden of justification upon the state"). Because the parental notification statute in this case infringes on the minor's fundamental right of privacy in her decision whether to terminate her pregnancy, in order to survive a constitutional challenge, the State bears the heavy burden of establishing that the statute "serves a compelling state interest and accomplishes its goal through the least intrusive means." T.W., 551 So.2d at 1192 (quoting Winfield, 477 So.2d at 547); see also Renee B. v. Florida Agency for Health Care Admin., 790 So.2d 1036, 1039-40 (Fla.2001); Chiles, 734 So.2d at 1033.
Unlike our deferential approach to legislative conclusions regarding statutes that do not implicate fundamental rights, our review of statutes that involve fundamental constitutional rights is "stringent." See Beagle v. Beagle, 678 So.2d 1271, 1276 (Fla.1996). When we undertake strict scrutiny review, we do not accept legislative statements of purpose at face value.[74] *647 As we stated in Chiles, when performing a strict scrutiny analysis, legislative "conclusions do not ... obviate the need for judicial scrutiny." 734 So.2d at 1034 (quoting Chiles v. State Employees Atty's Guild, 714 So.2d 502, 506 (Fla. 1st DCA 1998)). Moreover, under strict scrutiny review, the State cannot meet its heavy burden simply by stating that the interests are compelling without proof from the State that the compelling interests are in fact furthered by the statutory intrusion into the protected fundamental rights, and that the statutory intrusion is the least intrusive means to achieve that goal. See id. at 1034 (stating that the trial court "examined the statute independently to ascertain whether the committee staff's views, which reflect the state's position were borne out").
The presumption of validity applicable to rational basis review does not relieve the State of its three-pronged burden of proof under the strict scrutiny analysis. Further, when the issue is interference with the right to privacy or any other fundamental right, we recently stated:
We have found no cases in which this Court applied ... a narrowing construction to a statute challenged solely on the basis that its clear provisions violate a substantive constitutional right. The likely reason for this result is that the constitutionality of the statute, depending on the substantive right involved, depends solely on whether the statute passes the ... strict scrutiny test[ ].... Such a statute is unconstitutional under any circumstance unless the State satisfies its burden of establishing a compelling state interest.

Richardson v. Richardson, 766 So.2d 1036, 1041 (Fla.2000).
Just as our obligation to exercise restraint when reviewing statutes is paramount under rational basis review, our obligation to protect fundamental rights is paramount under strict scrutiny. Indeed, the United States Supreme Court has specifically held that "when we are reviewing statutes which deny some residents [a fundamental right], the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a `rational basis' ... are not applicable." Kramer v. Union Free School District, 395 U.S. 621, 627-28, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).
The very basis of a strict scrutiny analysis is that this is the one level of review that cannot allow for deference. This Court is "bound" to construe constitutional rights, which "operate[ ] in favor of the individual, against government," so as to "achieve the primary goal of individual freedom and autonomy." Traylor v. State, 596 So.2d 957, 963 (Fla.1992). As stated by founding father James Madison while advocating for adoption of the federal Bill of Rights, independent courts exist "to resist every encroachment upon rights expressly *648 stipulated for in the Constitution by the declaration of rights." Chapman v. California, 386 U.S. 18, 21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (quoting 1 Annals of Cong. 439 (1789)).
Certainly, however, this Court must also look at the entire record in determining whether the State has met its heavy burden of justification that applies only to the narrow class of statutes that infringe on fundamental rights. See Shaktman v. State, 553 So.2d 148, 152 (Fla.1989) (applying strict scrutiny in privacy case and stating that "[w]e are satisfied on this record that the law enforcement agencies had such a reasonable founded suspicion" necessary to justify intrusion into private lives). In this case, we have before us the factual findings of the trial court and an extensive trial record that was based on the presentation of evidence and testimony presented by both the State and the petitioners. Further, as noted in the majority opinion, there is no factual record from the legislative process. The Court's task is to determine, based on the factual findings and the records: (1) whether the State has met its heavy burden of demonstrating that the statute in fact serves a compelling state interest,[75] and (2) whether the State has carried its heavy burden of establishing that the statutory scheme serves that compelling state interest by the least intrusive means. Unless both prongs are satisfied, the statute must fail as unconstitutional.

B. COMPELLING INTERESTS ASSERTED BY THE STATE
The interests listed by the Legislature as compelling in the statement of legislative purpose fall into two categories: (a) those that are aimed at protecting the minor ("protecting minors against their own immaturity ... reducing teenage pregnancy and unnecessary abortion"); and (b) those that are aimed at preserving the integrity of the family ("fostering family unity and preserving the family as a viable social unit, protecting the constitutional rights of parents to rear children who are members of their household"). See ch. 99-322, at 3419, Laws of Fla.; see also State v. North Florida Women's Health & Counseling Servs., Inc., 852 So.2d 254 (Fla. 1st DCA 2001). I address the asserted interest of protecting the minor first.

1. Whether the Statute Furthers A Compelling State Interest of Protecting the Minor.
The compelling state interest upon which the First District relied and the first interest asserted by the State before this Court is "facilitating the ability of parents and guardians to fulfill their duty to provide appropriate medical care for their daughters or wards." North Florida, 26 Fla. L. Weekly at D422. This interest is not explicitly contained in the legislative list of "important and compelling" state interests; however, the interest is contained in the list of additional legislative purposes.[76] With regard to the question of *649 medical care, the First District's decision relied only on its view that the statute serves a compelling state interest regarding the parents' duty to assist in receiving proper post-surgical care after the abortion. See North Florida, 852 So.2d at 260.[77]
In the abstract, ensuring that teenage girls receive "appropriate medical care" is certainly an important government interest. However, at its core, this interest is one in "maternal health." In rejecting maternal health as a compelling state interest in T.W., the Court based its holding, in part, on the fact that "mortality in abortion may be less than mortality in normal childbirth." 551 So.2d at 1193 (quoting Roe v. Wade, 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)).
Further, the trial court in this case made factual findings as to the medical consequences of abortions and specifically found that
abortion is one of the safer surgical procedures. The risk of mortality or complication from abortion are very low. Certainly, in no qualitative sense, are the risks higher, or more unique for abortions than they are for child birth, or for other surgical procedures for which a minor may now lawfully consent without notifying her parents.
. . . .
Most minors, especially older minors, are perfectly capable of relaying the necessary medical information and history to the physician.
The trial court arrived at this factual finding after hearing extensive testimony. As we stated in Chiles, these findings are "presumptively correct and must stand unless clearly erroneous." 734 So.2d at 1034. Moreover, the Legislature neither made contrary factual findings regarding increased risks associated with abortion, nor provided any factual findings establishing that notification would make abortion a safer procedure for minors.[78]
In addition, the State's burden under the first prong of the strict scrutiny analysis requires a showing that the parental notification statute furthers those interests. Thus, it is not sufficient for the State to merely offer important interests as justification for state interference with a protected fundamental right. The State must also establish that an actual and substantial connection exists between the statute and the interests advanced. See, e.g., *650 Shaktman, 553 So.2d at 152 (holding that a "legitimate, ongoing criminal investigation satisfies the compelling state interest test when it demonstrates a clear connection between the illegal activity and the person whose privacy would be invaded").
In analyzing the asserted state interest in maternal health and whether the notification statute substantially furthers this interest, it is also entirely proper to look at the Legislature's treatment of other pregnancy-related conditionsas the majority has done in this case. In his dissenting opinion, Justice Wells views "legislative consistency as it was used in Justice Shaw's opinion in In re T.W. to be highly questionable as the sole basis for finding a statute unconstitutional." Dissenting op. at 673. However, contrary to Justice Wells' position, although review of other related statutes is not the only manner of analyzing whether the statute serves a compelling state interest, this method constitutes one tool in the independent review that we must undertake in performing a strict scrutiny analysis.[79]
Unlike rational basis review, which recognizes that the Legislature may make reasonable classifications and not address all evils at the same time, the more penetrating analysis required by a strict scrutiny test encompasses an assessment of legislative consistency to ascertain whether the State has actually targeted the interest it purports to address. In this case, we look to the fact that the Legislature has not chosen to require parental notification relating to other pregnancy-related conditions that are more dangerous than abortion in order to determine whether the true purpose of this legislation is to protect minors, or, instead, is to infringe on the minor's right to choose an abortion.[80] Our examination of this inconsistency is especially important considering the Legislature's unsupported conclusion that there are "unique medical, emotional and psychological consequences of abortion" that are "sometimes serious and can be lasting." *651 To the contrary, the trial court found that the medical, emotional, and psychological consequences of choosing to carry a child to term or put a child up for adoption can be even more serious and lasting than choosing abortion. Thus, the legislative justification for the privacy intrusion based upon the "uniqueness" of the abortion decision is undermined by the failure of the Legislature to consistently legislate in the area.
It is undeniable that the Legislature, through the Parental Notice of Abortion Act, imposes restrictions on minors who seek an abortion that it does not impose on minors who decide to carry their pregnancy to term. The First District concluded that the Legislature had legitimate reasons for treating pregnancy differently than abortion, including the fact that pregnancy does not normally require surgery, and that to the extent that pregnancy may involve surgery (e.g., a cesarean section), such surgery normally would occur during childbirth when most parents would already know about their daughter's condition. See North Florida, 852 So.2d at 261. However, the First District's conclusion regarding the reason for differential treatment is not supported by the record, which reveals that, as compared to adult women, minors have a higher risk of developing health complications throughout their pregnancy, including a higher risk of developing toxemia, a higher risk of miscarriage, and a higher risk of spontaneous abortionall of which can lead to hemorrhage, infection, infertility, and death.
The record also reveals that approximately fifteen percent of pregnancies end in miscarriage, which can necessitate a dilation and curettage ("D & C") or a hysterectomy. Moreover, the record reveals that basic medical procedures used during pregnancy, including intrauterine fetal diagnostic tests, also pose health risks to the patientsome comparable to those associated with a cesarean section. Yet minors undergo all these procedures without a requirement that a parent be notified before any pregnancy-related procedure may be performed.
Not only do the notification provisions fail to further the stated compelling interest in protecting maternal health, but the effects of the notification provisions may actually run counter to the stated purpose by hindering full disclosure of pertinent medical information. Based on the testimony presented, the trial court made the additional following findings regarding maternal health:
(1) Medical tests reveal the necessary information about a minor's condition;
(2) Most minors can relate their medical histories. In fact, some minors may be more reluctant to reveal medical histories if a parent is involved, especially with regard to sexual history or prior pregnancies;
(3) Sixty-one percent of minors already voluntarily involve their parents in the abortion decision. Only ten percent of children under 15 do not involve their parents compared to forty-nine percent of 17 year olds;
(4) Of those that did not tell their parents, thirty percent experienced violence in the home.
Thus, it would appear that though the older minors are the ones less likely to voluntarily notify a parent, these minors would be more likely to provide accurate medical information. Furthermore, only a small percentage of younger minors are not already voluntarily telling their parents. And significantly, a substantial percentage of the minors who are not voluntarily notifying a parent experienced violence in the home.
*652 In determining that the statute does not serve a compelling state interest but may run counter to the purported state interest of protecting maternal health, the trial court also found that to avoid telling their parents some minors "without doubt will [have] illegal abortions or self-induc[e] abortions." Further, faced with a mandatory parental notification some teenage girls may delay the abortion decision or resort to alternative, unsafe methods of aborting. Indeed, the record reveals that sixty-three percent of minors having abortions at sixteen or more weeks gestational age cited fear of telling their parent or partner as a reason for their delay. This delay is significant with regard to maternal health when coupled with the fact that, after approximately the eighth week of pregnancy, the risk of medical complication from an abortion increases by twenty percent for each week of delay. Regardless of the State's interest in protecting maternal health, the State has not met its heavy burden of proving that the Act furthers or serves those interests in any substantial or meaningful way. To the contrary, as demonstrated above, rather than serve the Legislature's compelling interests in protecting the health of the minor, the minor's health may in fact be harmed by the notification statute. In sum, the statute does not further a compelling state interest in maternal health because abortion is one of the safer procedures; minors can accurately relate their own histories; the notification provisions may discourage full disclosure of pertinent medical information; and medical tests reveal the necessary information.

2. Whether the Statute Furthers a Compelling State Interest in the Integrity of the Family.
I next address whether declaring this statute unconstitutional infringes on the constitutional rights of parents, and specifically respond to the concerns of Justice Lewis. Justice Lewis asserts that the state "has a legitimate interest to aid in the parental discharge of the primary and fundamental duties and responsibilities with regard to child welfare and safety." Concurring in result only op. at 665. I agree that this Court has, on numerous occasions, recognized and upheld the fundamental liberty interest of parents in the care and custody of their children. See, e.g., Richardson v. Richardson, 766 So.2d 1036, 1037 (Fla.2000); Von Eiff v. Azicri, 720 So.2d 510, 511 (Fla.1998); Beagle v. Beagle, 678 So.2d 1271 (Fla.1996).[81] In my view, the majority's holding today serves both to protect the minor's privacy rights and to guard against State intrusion into the privacy of the family.
In Von Eiff, we analyzed whether a statute granting grandparents visitation *653 rights impermissibly infringed on parents' fundamental privacy rights. See 720 So.2d at 511. In doing so, we noted that "the State may not intrude upon the parents' fundamental right to raise their children except in cases where the child is threatened with harm." Id. at 514 (quoting Beagle, 678 So.2d at 1276). In invalidating the grandparent visitation statute we further noted that "[b]y applying this type of analysis, ... [the court] avoid[s] the `unquestioning judicial assumption' that grandparent-grandchild relationships always benefit children, an assumption that overlooks the necessity of a threshold finding of harm before the state can intervene." Id. at 515 (alterations in original) (quoting Hawk v. Hawk, 855 S.W.2d 573, 581 (Tenn.1993)).
The analysis we employed in Von Eiff is actually applicable in this case. Rather than protect parents and families from State interference into their private lives, mandating parental notification injects the State into the family unit by forcing family members to communicate about an issue the State has determined requires parental involvementeven when it has declined to mandate such involvement in any other pregnancy-related treatment. Indeed, in this case, just as in Von Eiff, the challenged statute compels familial communication based on the State's assumption that such interaction will be in the child's best interest. As noted above, the State has been unable to demonstrate that parental notification is necessary to protect the health of the minor. As we stated in Von Eiff, absent a threshold finding of threatened harm to the minor, the State may not intrude into the privacy of the family by mandating interaction.
We emphasized in Von Eiff that "our determination today [was] not a comment on the desirability of interaction between grandparents and their grandchildren. We focus[ed] exclusively on whether it [was] proper for the government, in the absence of a demonstrated harm to the child, to force such interaction...." Id. at 511 (quoting Beagle, 678 So.2d at 1272). Similarly, today's decision is not a comment on the desirability of communication within the family unit regarding a minor's abortion decision. By placing an obstacle, either parental notification or the judicial bypass procedure, between the minor and her decision to have an abortion, the statutory scheme infringes on an important fundamental rightthe minor's right of privacy in her reproductive decisions, which is protected under our state constitution. See T.W., 551 So.2d at 1193.
Therefore, I now turn to whether the State has carried its heavy burden of establishing a compelling state interest in preserving the integrity of the family so as to justify the state involvement in a minor's abortion decision, especially in light of its disparate treatment of abortion among all other pregnancy-related conditions. Although the State's interest in preserving the integrity of the family unit is an important and worthy objective, we nonetheless held in T.W. that the State's interest in this objective did not rise to a compelling state interest to justify the intrusion on a minor's privacy rights by the parental consent statute at issue in that case. See T.W., 551 So.2d at 1195.
The question is whether the objectives advanced by the State are more compelling with regard to parental notification than they were with regard to parental consent. The answer to that question turns on whether the State has carried its burden of establishing that mandatory parental notification substantially furthers a compelling state interest in preserving the family unit.
It would seem reasonable that minors who have the benefit of their parents' support *654 in all of life's difficult decisions may be better equipped emotionally before, during, and after the abortion procedure. However, in its order the trial court found no evidence that the notification would preserve the family unit. In fact, it is the pre-existing relationship with the child that determines whether a young woman will involve a parent in this difficult decision. As the trial court stated:
For some minors, involving a parent in the decision making process would be desirable. For some minors, it would not....
[N]ot every minor comes from a Norman Rockwell family and some minors have legitimate fears of physical and emotional abuse if their parents are consulted....
Even if their fear or concern is irrational, it is very real to them.
The trial court's reference to the fact that "not every minor comes from a Norman Rockwell family" is a tactful way of pointing out that girls who fear notifying their parents may in fact be adversely harmed by the compelled notification process. The fact that the record indicates that thirty percent of the girls who did not notify their parents revealed a history of family violence certainly gives rise to justifiable concerns that the statute will not in fact foster family unity.
The reality is that many of those minors, most of whom are near the age of majority, who choose not to notify their parents of their abortion decision do so for very defined reasons. The record reveals that young women who do not tell a parent fear, among other things, physical abuse, emotional abuse from an unsupportive parent, being forced to leave home, withdrawn financial support, or added tension to an already stressful home life due to an ill or unemployed parent. Thus, there is evidence that a mandatory parental notification statute could cause family tension, trauma, and irreparable rifts.
In conclusion, there are two reasons the asserted interests in family unity fail as a compelling state interest furthered by this statute. First, absent harm to the child, this Court has traditionally protected the fundamental rights of parents by refusing to force interactions within families and not by mandating communication. Second, however worthy the stated goals of family unity may be, the State has failed in carrying its heavy burden of establishing that the notification statute furthers the State's "compelling interest" in promoting family unity.

C. LEAST INTRUSIVE MEANS
Even assuming the Act substantially furthered a compelling government interest, in my view the statute still would constitute an unconstitutional infringement on the minor's fundamental rights because the statute does not further its goal through the least intrusive means. I begin my discussion with the extent to which the parental notification statute interferes with the young woman's decision to have an abortion. The dissent does not address whether the statute has set up a procedure that is the least intrusive means to ensure that a minor receives proper medical care after an abortion.
The dissent argues that "there is a very real difference between parental consent... and ... parental notification." Dissenting op. at 668. This argument ignores the true implications of parental notification and the facts as found by the trial courtthat is, that "the parental consent and the parental notification statutes are very similar in their intended and expected effect."
Indeed, the record supports the conclusion that minors fear parental notification *655 for the same reasons they fear parental consent. The minor's fear is not centered on the prospect of withheld parental consent; rather, the minor's fear is often founded on the fear of having to tell the parent of the pregnancy and, consequently, the sexual activity that led to the pregnancy. Although "consent" is not required, young women may legitimately fear that the notification requirement in fact will give their parents veto power over their decisions, effectively depriving them of their ability to exercise their choice.
Some fears may be unjustified but, as noted above, many fears are in fact based on an unhealthy and violence-ridden home environment. Under both notice and consent laws, minors fear that telling their parents about an impending abortion will result in abuse, being expelled from the home, disturbing an already dysfunctional or troubled family situation, or a parent exercising a de facto veto power over the minor's decision. The young women may fear violence, physical and emotional abuse, termination of support or increased strain on an ill or unemployed parent. Some young women may have fundamentally different religious preferences from those of their parents that impact their respective stances on the abortion question. The record establishes that for a minor who does not want her parents to know of her pregnancy or her decision to have an abortion, the impact of the parental notification requirement is similar to that of a parental consent law. For those minors, the only alternative to notification is the judicial bypass procedure. However, rather than being the least restrictive alternative to notification, the judicial bypass procedure, even at its best, is a cumbersome and burdensome method of avoiding the notification requirement. Under the strict scrutiny standard applicable to an inquiry under Florida law, the intrusive nature of the notification statute is not remedied by the judicial bypass procedure.
Although I have the highest regard for the judiciary and the judicial process, we must be acutely mindful that the statutory judicial bypass procedure is one that would be daunting for any young person to navigate. As the Supreme Court of New Jersey stated when deciding whether a similar judicial bypass procedure cured the constitutional infirmities of that state's similar statute:
[T]he judicial waiver provisions impose far greater burdens on minors who, for very good reasons recognized by the statute, are unable to communicate with their parents about their decision.
In the first instance, a young woman must find a way to place the initial call to the courthouse to begin the waiver process. Next, if she chooses to have an attorney, as provided by the Act, she must find a time when she can take his or her telephone call without the knowledge of her parents or siblings. Then the young woman must get to the courthouse, which may be difficult depending on distance and access to transportation. To complicate matters further, she may well have to be absent from school and risk her parents finding out that she has been truant in order to attend a judicial proceeding.
.... Although it is irrefutable that burdens and delays already exist in a minor's pursuit of an abortion, we are concerned only with those burdens that are created by state action. In any case, additional impediments added to existing impediments may well prevent the exercise of a fundamental right altogether. That would be unacceptable without substantial adequate justification for the classification created by the Legislature.
Farmer, 762 A.2d at 634-36.
Indeed, in Florida our judicial bypass procedures are similarly burdensome on *656 the minor in that they contain provisions that can seriously impact the minor's privacy by loss of confidentiality and, by creating delay, affect the ability to obtain a safe abortion. Even in the best of circumstances, navigating the judicial bypass procedure will add days if not weeks to the time for the abortion, thereby increasing the risk to the minor. As previously noted, the risk of complications from an abortion increases by about twenty percent for each week of delay in obtaining an abortion.
Facing the prospect of navigating the judicial bypass procedure, the minor may fear that her private decision may become known, especially in many of the smaller communities throughout Florida. Even in the best of circumstances, a minor must divulge very private matters to total strangersa circuit court judge and other court personnel. Even though the record is "sealed," court personnel who must handle the minor's record will have access to information revealing the minor's identity. In a small-town community, a minor may be effectively prevented from utilizing the judicial bypass procedure for fear that someone in the court will discover her purpose.
In addition to the natural anxiety of navigating the judicial process, a young woman also faces real life logistical difficulties, including explaining absences to school personnel, arranging for transportation, and the possibility of multiple court appearances. The process could operate to either delay the time in which to have a safe procedure or in the end effectively bar a minor from exercising her constitutional right of choice. Thus, the statute does not serve a compelling state interest through the least intrusive means.[82]

CONCLUSION
A determination by this Court that the Act is unconstitutional serves only to maintain the State's neutrality regarding the abortion decision. Indeed, invalidating the Act will not hinder a young woman from voluntarily seeking the advice of her parents or from voluntarily seeking counseling prior to making the abortion decision. Declaring the Act unconstitutional does not prevent parental involvement. That matter rests as one between a parent and a child. Rather, the majority holds only that where the State has not carried its heavy burden of establishing that the notification statute furthers a compelling state interest through the least intrusive means, the State may not mandate parental notification that interferes with the right of privacy.
*657 As observed by the California Supreme Court in Am. Acad. of Pediatrics v. Lungren, 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797 (1997), in analyzing our decision in T.W:
[T]he court in In re T.W. was not suggesting that the interests of "protecting minors" and "preserving family unity" were not, in themselves, sufficiently important or vital interests to be characterized as "compelling," but rather was explaining that the other Florida statutes to which it referred demonstrated that imposition of a parental consent requirement was not necessary to serve or further those important interests.
Id. at 826 n. 28 (emphasis added).
For those minors who do not voluntarily inform a parent of their abortion decision, this statute does not serve a compelling state interest in either protecting the minor's health or preserving family unity. Rather, the statute impermissibly interferes with a minor's ability to freely exercise her right of reproductive choice by requiring either parental notification or, in the alternative, a complex judicial bypass procedure. Any connection between the stated goals and the means to achieve the goals is either insubstantial or illusory and should not justify interference with the fundamental right of privacy.[83]
As the trial court observed in this case, rather than serving a compelling state interest in maternal health or family unity, the differential treatment afforded to abortion sends the following message to the hypothetical minor:
If you make the choice we want you to, we will leave you alone. If you don't, we're going to make it more difficult to exercise your choice. This is exactly the kind of government interference into personal, intimate decisions that the privacy clause protects against.
I thus concur in holding this statute unconstitutional as a violation of the right to privacy guaranteed by article I, section 23 of the Florida Constitution.[84]
ANSTEAD, C.J., and QUINCE, J., concur.
QUINCE, J., specially concurring.
I agree with the majority's opinion in this case because both the privacy amendment to the Florida Constitution and prior precedent from this Court, In re T.W., 551 So.2d 1186 (Fla.1989), compel the conclusion that the Parental Notification of Abortion Act (the Act) is unconstitutional. I write simply to express my views that the *658 Court cannot view this issue through the lens of whether or not the Act, requiring a medical provider to notify a parent or guardian before a minor female gets an abortion, is good or bad public policy; we must simply determine whether the legislative enactment violates the Florida Constitution.
We determine the validity of a legislative enactment by applying the principles embodied in the Florida Constitution, which is the paramount expression of the law by the people of this State. The duty of this Court "to maintain the constitution as the fundamental law of the state is imperative and unceasing." City of Miami Beach v. Lachman, 71 So.2d 148, 150 (Fla.1953). As the majority points out, the people of this State in 1980 amended the Constitution to provide for a free-standing right to privacy. Article I, section 23 of the Florida Constitution provides, in pertinent part, that "Every natural person has the right to be let alone and free from governmental intrusion into the person's private life...." In interpreting this portion of the Declaration of Rights, this Court said that the right to "privacy encompasses much more than the right to control the disclosure of information about oneself." In re Guardianship of Browning, 568 So.2d 4, 9 (Fla.1990). The right to privacy includes the right to liberty and self-determination. See id. Moreover, the right to privacy is implicated when restrictions are placed on the ability of females, including minor females, to obtain an abortion. See In re T.W., 551 So.2d at 1192-93. Unlike the right to privacy guaranteed by the United States Constitution, the right to privacy guaranteed to the citizens of Florida is explicit in our Constitution and affords more protection to our citizens than does the federal right.
As this Court said in Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985), the right to privacy is a fundamental right that demands that the State demonstrate a compelling state interest before it can constitutionally intrude on that right. And in T.W., this Court indicated that neither the health of the mother, the potentiality of life in the fetus (prior to the end of the first trimester), nor the preservation of the family unit were compelling enough to override the individual's privacy interest. While our courts have found that parents have a fundamental liberty interest in rearing their children, see Padgett v. Dep't of Health & Rehab. Servs., 577 So.2d 565 (Fla.1991), that right protects against state interference in family life. In this case, the State is interfering with the right to privacy by mandating parental involvement.
While those of us who are parents may want to know if our minor daughter has engaged in sexual conduct that has resulted in a pregnancy and may believe it is desirable to have notice of this fact, that is not the issue that has been presented to this Court. Indeed, that is not a proper consideration for this Court. As has so often been said, it is not the role of the courts to set policy or to engage in judicial legislation. We have long recognized that it is not this Court's "function to substitute its judgment for that of the Legislature as to the wisdom or policy of a particular statute." State v. Rife, 789 So.2d 288, 292 (Fla.2001). However, this Court does not "violate the separation of powers doctrine by determining whether a legislative enactment was constitutionally adopted." Chiles v. Phelps, 714 So.2d 453, 456 (Fla. 1998). "[A]s the highest court of the judicial branch of government, one of our primary judicial functions is to interpret statutes and constitutional provisions." Id. See also Locke v. Hawkes, 595 So.2d 32, 36 (Fla.1992). The decision today recognizes that the policy for this State was set by the electorate when it approved the constitutional *659 amendment that added the privacy provision to the Florida Constitution.
Undoubtedly, Florida's parental notification statute was designed to give minor females the benefit of consultation with a caring and supportive parent before making the decision of whether or not to have an abortion. This is a commendable purpose indeed. However, even a commendable purpose is not enough to demonstrate a compelling interest on the part of the State. Where a legislative act burdens a fundamental right, more than a commendable purpose is necessary for a statute to survive strict scrutiny analysis. Because the notification statute violates the right to privacy as provided for in the Constitution, I concur with the majority that the statute is unconstitutional.
PARIENTE, J., concurs.
LEWIS, J., concurring in result only.
I am compelled to concur in the result attained today only upon application of the principle originally constructed by the majority in In re T.W., 551 So.2d 1186 (Fla. 1989), requiring legislative consistency as an essential element in the "compelling interest" constitutional analysis. Although in this context I seriously question the applicability of Ivey v. Bacardi Imports Co., 541 So.2d 1129 (Fla.1989), the singular authority upon which the T.W. majority was constructed, involving a discriminatory import and excise tax scheme on foreign alcoholic beverages analyzed under the Commerce Clause and Twenty-First Amendment concerns, the legislative consistency analysis has become the applicable framework for consideration and, in my view, has been expanded even further by the majority today.
While I do concur with much of the majority's discussion, and that of Justice Pariente, regarding standards of review and the parameters which bound this Court's treatment of constitutional questions concerning fundamental rights, I cannot agree with the majority's further expansion of this Court's T.W. decision. The majority's decision today that "the State has failed to prove that the Parental Notice Act furthers a compelling State interest," majority op. at 639, ascribes to T.W. an expansive holding which is in my view entirely contrary to logic and common sense. It is certainly more expansive than any express provision in T.W. I cannot agree that T.W. should have blazed such a dramatic and extreme trail, and I cannot concur with the majority's extension of the holding of T.W. even further, but I recognize that T.W. controls resolution of the issues before the Court today.
If I were writing on a clean slate, a fair impact of T.W. should have demonstrated that it be limited to only a holding that Florida's failure to require parental consent for adoptions and other reproductive medical or surgical procedures other than abortions established the lack of a compelling interest to be furthered by a parental consent requirement in the abortion arena. See T.W., 551 So.2d at 1195. T.W. should not have proceeded to absolutely determine that the State has no compelling interest in protecting the health and welfare of immature minors, a holding ascribed to T.W. by today's majority which, in my view, is completely unreasonable. Indeed, with T.W. being interpreted to have established the proposition that the State cannot act to protect the physical well-being of minors in this reproductive/medical/surgical arena, absurd results can abound. Under this reasoning, any attempts to regulate abortive surgeries upon minors are subject to constitutional inquiry, because the State's interest in ensuring the safety of minor patients may not be "compelling." The State would be limited in requiring sterile conditions for *660 surgery, minimum certification and educational qualifications for caregivers, and even adherence to minimum medical standards for care and treatmentall because the State's interest in protecting minors is not of sufficient consequence to warrant any intrusion into the privacy realm. I simply cannot agree that T.W. should have established that there can never be a compelling state interest to protect the health and welfare of minors in this arena. Although Justices Pariente and Anstead attempt to disclaim this result and assert that these issues are for another day, they have today not only reinforced T.W. but have expanded the lack of a compelling state interest basis as the foundation for the future. Although one may attempt to disclaim the inevitable consequences, the impact is nonetheless clear.
The more reasonable, and, I submit, a more proper limitation upon the holding in T.W. should have been that the State's proposed method of protecting the health of pregnant minors by establishing parental veto power was so incongruent with Florida's treatment of other situations in which pregnant minors were regulated by statutory law that the compelling interest of protecting the welfare of legally immature Floridians could not support such a drastic intrusion upon the privacy of minors. Indeed, no portion of T.W. should have condemned the State's interest in safeguarding the physical welfare of minors without specific mention of the substantive issue of the State's cumbersome method of accomplishing its goalthe parental consent/veto requirement. See id. at 1194-96. In my view, T.W. should stand only for the limited principle that the State's otherwise compelling interest in looking after the health and physical welfare of its minor citizens cannot support the imposition of a categorical, dramatic parental consent restriction. The T.W. decision certainly should not have provided that the State may not intrude in any fashion upon the privacy of minors to protect their health and welfare. Thus, I cannot agree with today's decision which ascribes this specific expanded holding to T.W.
The broad and general question before us today is centered upon consideration of the nature and extent of constitutional prohibitions upon the requirement for parental notification before medical or surgical procedures are performed upon children. This situation brings into focus the tension between multiple generally recognized primary interests related to the privacy rights of a child to determine her own medical and surgical alternatives; the independent parental interests to be involved in the life of their children and responsible for their safety; and, finally, the governmental interest directed toward both the welfare of children, and to support and advance parental interests for the safety of children. There is a very definite, recognized primary role of parental involvement in the lives and safety of their children. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).
While I am convinced that the rights and interests with regard to the medical and surgical intervention involved here do have balancing parameters subject to a strict scrutiny standard and that minor females have definite protected interests, I am also of the view that T.W. and the majority today do not provide the fundamental liberty interests of parents in the care, custody, and involvement with their children, connected with the corresponding firm responsibility for the well-being of their children, and the legitimate and compelling *661 interests of the state related to the welfare of children and to support the parental interests, the consideration each should and must receive. As one may juxtapose the essential liberties of minor children and natural parents along with the corresponding state interests, the narrow path of analysis should lead to the conclusion that a parental notification statute, with judicial bypass procedures, serves compelling state interests and is properly narrowly tailored to further those compelling state interests.
It is absolutely clear that adult females have protected liberty and privacy interests to engage in independent private medical and surgical decision processes free from unwarranted governmental intrusion. See T.W., 551 So.2d at 1192-93. The sanctity of individual free choice and self-determination with regard to surgical, medical, and bodily issues is beyond reproach. It is also true that minors have independent protected liberty and privacy interests that cannot simply be ignored, and that children are not to be considered mere possessions to be manipulated by those who claim to possess more mature thought processes. While these adult-child liberty and privacy interests may reflect similar images, children are, and traditionally have been, treated somewhat differently under our constitution and laws. The status, position, and analysis with regard to children have always been viewed as unique under our constitutional system, and our laws have consistently reflected and recognized the very special and unique position of children. Our constitutional concepts have not operated to simply transfer and transpose all areas of adult legal concepts into and upon concepts and circumstances unique to children. Constitutional principles and laws have recognized and protected areas unique to the position of children and the corresponding related parental obligations. It is not simply the intrusion of current societal or personal values or judgment systems that frame the issue, rather the issues are defined by simple truths based on common sense, along with historical and cultural experiences of Western civilization, that children are vulnerable and commonly have different maturity and experience levels than adults. This calls forth unique and different approaches, including recognition of parental interests, rights, and corresponding obligations, when welfare issues concerning the protection of a child arise.
From recognition of the frailties and uniqueness of children flows the natural and discrete fundamental parental liberty interest, and corresponding parental obligations of primacy in the parent-child family welfare discussion. See Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). This Court has specifically recognized this fundamental liberty interest of natural parents in the care, custody, and welfare of their children. See Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 570 (Fla.1991) (recognizing the "longstanding and fundamental liberty interest of parents in determining the care and upbringing of their children"); see also Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In presenting the decision of the Court in Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998), in connection with the status of family relationships, Justice Pariente recognized: "Neither the legislature nor the courts may properly intervene in parental decision-making absent significant harm to the children threatened by or resulting from those decisions." Id. at 514.
There can be no doubt that "[i]t is cardinal... that the custody, care, and nurture of the child reside first in the parents." *662 Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The interest of parents in guiding the upbringing of, and providing for the safety and well-being of, their children has been recognized by the United States Supreme Court, as well as this Court, as being fundamental on numerous occasions. See, e.g., Troxel v. Granville, 530 U.S. 57, 64, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); Moore v. East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); J.B. v. Florida Dep't of Children & Family Servs., 768 So.2d 1060, 1065 (Fla.2000); Von Eiff, 720 So.2d at 513. This integral right and corresponding responsibility to remain thoroughly involved in the life of one's child is accompanied by a parent's corollary "obligation to nurture, support, educate, and protect" the minor child. Finn v. Finn, 312 So.2d 726, 730 (Fla.1975). This responsibility is independently enforceable, as the "child has the right to call on [the parent] for the discharge of this duty." Id.
In numerous decisions, Florida courts have recognized that the parental right and duty to be involved in guiding and protecting one's child as he or she progresses toward adulthood includes the very real obligation to "provide reasonable and necessary medical attention for his [or her] child." DeCosta v. N. Broward Hosp. Dist., 497 So.2d 1282, 1284 (Fla. 4th DCA 1986); see also State v. Winters, 346 So.2d 991, 993 (Fla.1977); Variety Children's Hosp., Inc. v. Vigliotti, 385 So.2d 1052, 1054 (Fla. 3d DCA 1980). Indeed, failure to provide one's child with adequate medical care certainly constitutes child abuse. See Eversley v. State, 748 So.2d 963, 970 (Fla. 1999); State v. Riker, 376 So.2d 862, 862 (Fla.1979). Additionally, absent some emergency or occurrence which requires "medical treatment ... necessary for the preservation of life," M.N. v. S. Baptist Hosp. of Florida, Inc., 648 So.2d 769, 770 (Fla. 1st DCA 1994), the state and other non-parents have absolutely no authority to administer any form of medical treatment, surgery, or even physically examine a minor without the permission of a parent. See generally id.; J.V. v. State, 516 So.2d 1133 (Fla. 1st DCA 1987); In re Ivey, 319 So.2d 53 (Fla. 1st DCA 1975). Absent state action authorizing the performance of the surgical procedures at issue today upon minors, such action would be entirely impossible without parental participation. Thus, even without mandatory parental notification procedures, the state is already imminently involved in this most private of personal decisions. I conclude that the parental notification provision at issue today is certainly no more intrusive in the private affairs of minors than is the original governmental authorization to seek elective medical and surgical procedures.
Although T.W. and the majority today demand legislative consistency as the cornerstone of constitutional analysis, each totally overlooks and ignores the totality of the competing constitutional interests which should be considered. Precedent from this Court requires that when competing fundamental constitutional interests are presented, or multiple constitutional concepts face conflict, we must search for harmony to provide each a field of operation. In Local Union No. 519 v. Robertson, 44 So.2d 899 (Fla.1950), we considered, in the labor context, the competing fundamental constitutional interests related to free speech and expression on one hand with the right to work in Florida on the other. There we reasoned that judicial determinations must necessarily harmonize conflicting constitutional interests arising from the same document. Here, in the majority's analysis, harmony of a constitutional magnitude is sacrificed for legislative *663 consistency as the foundation for ever finding any compelling state interest. It appears that the majority simply moves the intellectual analysis to a new level that actually analyzes every shred of common sense out of the determination equation. Even the trial judge, quoted with extreme approval by the majority, understood and expressly set forth the interests which should undergird the entire analysis:
[P]rotect minors from their own immaturity, preserve the family unit and parental authority, prevent, detect, and prosecute sexual batteries upon minors. I can't imagine any serious disagreement over the importance of these interests to our society. The family unit is the cornerstone of civilized society. We depend on parents to protect, guide, and socialize their children, to help make them law abiding, productive members of the community. We hold parents responsible for their childrenas we shouldand we should be about the business of helping them, certainly not hindering them, in carrying out this responsibility.

(Emphasis supplied.) Sound logic; but mere lip service, as the notion is entirely eliminated from the legal analysis today. Further, I find the majority's declarations that "our decision today in no way interferes with a parent's right to participate in the decision-making process" and that a "parent ... [is] free to do as they wish in this regard" are extremely hollow and far lacking in intellectual ingenuity. Without notice and knowledge of the facts, parents are effectively totally excluded from the process in this judicial equation.
I am persuaded that the right and duty of Florida's parents to maintain the physical well-being of their children through appropriate medical care must encompass the right to be notified of invasive surgical procedures, if such rights and obligations are to have any meaning and be realized. Absent some overriding policy justification or emergency, a parent or guardian should be made aware that his or her child will be undergoing any medical procedure. Otherwise, the fundamental liberty interest in guiding the well-being and physical growth of one's children is diminished and usurped. Simply stated, if a parent is not informed of actions which may negatively impact the health of his or her child, the fundamental interest in directing and satisfying the obligation for the medical care itself has no meaning.
The fundamental liberty interest in the upbringing of one's child encompasses the right to be informed of the occurrence of invasive surgical procedures upon the child; therefore, "the State can properly conclude that parents ... who have the primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." Bellotti, 443 U.S. at 639, 99 S.Ct. 3035. In the instant case, the Legislature of the State of Florida has chosen to support the parental rights and obligations by mandating that a parent or guardian be given notice of their child's medical and surgical procedure prior to actual surgery. I do recognize, however, that it is beyond dispute that the notification provisions at issue here constitute a restriction upon the ability of minor females to have total and absolute freedom with regard to medical and surgical issues. See T.W., 551 So.2d at 1192-93. Thus, this Court is faced with a situation in which two fundamental rights are in unavoidable conflict.
The final element in the analytical process which must be evaluated is consideration of the government's position and interest within these areas of competing, and at times, conflicting interests. The state has a definite and discrete interest in the safety and welfare of children and exercises *664 this responsibility in a number of different ways. This interest is not one grounded upon mere shifting value judgments of the day, nor exercised through obstacles or arbitrary barriers only tangentially related to fundamental substantive concepts. The clear and legitimate interest in the welfare of children recognizes the frailties of youthful judgment, immaturity, inexperience, and susceptibilities, and the importance of a knowledgeable, informed, and intelligent decision process, particularly here, in connection with the medical and surgical care and treatment of children. This principle was specifically noted by the trial court in its order below. Essentially, the trial court agreed with the Legislature that minors often do not possess the ability to make fully informed healthcare decisions which could affect them for the remainder of their lifetime, and that inclusion of parents in medical decision-making is desirable. The court specifically found "the younger and less experienced the minor the less her ability to exercise sound judgment." Therefore, "all things being equal, the ability to consult with a parent on medical history is desirable, [and] ... having a supportive parent involved is certainly preferable." In my view, the conclusion of the majority that legally immature minors should be permitted to chart their own course in this area without any parental participation runs directly counter to the trial court's logical determination that parental involvement is positive and desirable.
Most assuredly, minority in and of itself impacts and shapes the nature and extent of the state's interest here, not subjective value judgments. In my view, the law recognizes a qualitative difference between minority and adulthood. It is only logical that the scope of a minor's fundamental rights is not coextensive with coordinate rights of adults. Indeed, the United States Supreme Court has stated that "although children generally are protected by the same constitutional guarantees against governmental deprivations as adults, the State is entitled to adjust its legal system to account for children's vulnerability and their needs for concern, sympathy, and paternal attention." Bellotti, 443 U.S. at 635, 99 S.Ct. 3035 (internal quotation marks omitted). Additionally, "state interests inapplicable to adults may justify burdening the minor's right." H.L. v. Matheson, 450 U.S. 398, 442 n. 32, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981); see also Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination."). In truth, the instant case is a prime example of a situation in which the state is acting in support of an interest that would be completely irrelevant were an adult seeking this surgical procedure. It is only where a minor intends to submit to a surgical procedure along with the corresponding medical risks that the state has any interest in requiring that those totally responsible for the physical and emotional well-being of the child be notified of the procedure.
Secondly, the state also has a legitimate interest to aid in the parental discharge of the primary and fundamental duties and responsibilities with regard to child welfare and safety. In a similar manner, the state has an interest to support and aid the involvement of natural parents in the lives of their children in connection with their care, nurturing, safety, and welfare as the circumstances may require. These circumstances may vary, but I consider the area of medical and surgical care, treatment, and conditions to be a realm within which parental involvement and responsibility should reach its zenith. The deliberative process to attain informed decisions *665 with regard to medical and surgical care and treatment options calls for the most sound and judicious of decision-making processes available. A full and complete understanding of the medical or surgical treatment available, along with the corresponding impact upon the human condition related thereto, must be intelligently explored. The source and location of the facility to be involved must be probed before a truly informed decision may be made. The background, training, competence, and skill of any medical professional to be involved demands the utmost critical examination.
These types of considerations regarding the health, safety, welfare, and well-being of a child cause me to conclude that the fundamental liberty interest of parental involvement is not so inconsistent or at odds with the discrete individual interest of a child, or the sanctity of individual free choice and self determination for children that the state can absolutely never have a compelling interest in this arena to support some type of parental knowledge concerning his or her child, as the majority holds today. If the slate were clean, I would conclude that there is a compelling state interest that parents have information concerning, and knowledge of, any medical or surgical care, treatment, or procedures to be performed upon their children. Although Justice Pariente attempts to draw artificial distinctions with regard to parental involvement in medical or surgical procedures based on the timing of the involvement, such is a distinction without a substantive difference. Parental involvement interests should apply before, during, and after medical or surgical procedures. This flows from both the independent interest of child safety and welfare, and the interest to aid, support, and facilitate parental interests and the exercise of parental responsibility and obligations with regard to their children.
Next, we must evaluate whether any burden upon, or obstacle to, a child's exercise of absolute and unrestrained self determination is the most narrowly tailored and circumscribed, and reasonably related to a legitimate compelling state interest. Knowledge, which is the cornerstone of informed conduct, may only be obtained through some form of notice process. It would be totally naive to believe that all parental responses to any form of notice under the circumstances we consider would be uniform, consistent, or even positive. I have concerns as to the ramifications flowing from the practical application of this statutory plan. However, attempting to legislate how a parent will or may respond under these most delicate of complex matters is simply beyond state control. As Justice Barkett noted, "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents...." Padgett, 577 So.2d at 571-72 (Barkett, J., specially concurring) (quoting Santosky v. Kramer, 455 U.S. at 753, 102 S.Ct. 1388).
Additionally, the value judgments related to this very sensitive area of concern are not, in my view, a constitutional basis upon which we should rely to invalidate the statute before us. In a similar manner, concerns with regard to whether the legislature may or may not have wisely enacted other provisions touching upon medical situations or circumstances in statutes not before us today, with which we may agree or disagree, cannot be the constitutional basis upon which a successful attack may be mounted today. Notice does not and will not always produce ideal results, but it is, in my view, the most narrowly circumscribed approach when tempered with an appropriate judicial bypass procedure. Indeed, this principle was *666 recognized by the trial court below when it noted that "the requirement of notification is certainly less restrictive than the requirement of parental consent." The bypass procedure, in my view, renders notice the very least intrusive method of realizing and implementing the legitimate and compelling interest. While the examination of the constitutionality of parental notification statutes under the federal Constitution differs from that applicable under the Florida Constitution, most notably in the level of applicable "scrutiny," I find it extremely noteworthy that the United States Supreme Court has concluded that notification statutes similar to the legislation before this Court today are "narrowly drawn" and permissible methods of ensuring parental participation in the life of children. See H.L. v. Matheson, 450 U.S. 398, 413, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981); see also Lambert v. Wicklund, 520 U.S. 292, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997). The bypass procedure provides an informed, deliberative process within which sound and judicious decision-making in this very sensitive and complex area may be conducted. I also recognize that the bypass procedure is no absolute guarantee of positive resolution of all human problems in this complex, delicate, and important process, but all we may do is that which is humanly possible and recognizes and applies constitutional concepts as we understand them.
Although the majority seems to reject the parental notification concept based exclusively on a lack of a compelling state interest analysis, it is most revealing that even if compelling state interests existed, Justice Pariente and Justice Anstead would go further to totally eliminate any possibility of parental or judicial involvement whatsoever. By directing our attention to and condemning the frailties associated with aspects of normal judicial proceedings and focusing with approval on the procedures in other jurisdictions that totally eliminate parental involvement through either counseling by total strangers who are actually performing the surgical procedures or abdicating all parental involvement exclusively to the decision of the total stranger performing the surgical procedure as examples of least intrusive measures, one could never satisfy their vision of "least intrusive" if parents of minor children are ever involved in the process. While Justices Pariente and Anstead wish to have their views interpreted otherwise, their displeasure with contempt for judicial proceedings and preference for the placement of the decision process in the hands of those strangers actually performing the medical and surgical procedures overcome the protestations of interpretation. I cannot agree with such condemnation of normal judicial processes, the total rejection of parental involvement, nor the placement of the decision process exclusively in the hands of total strangers who will perform the medical or surgical procedure.
While concerns regarding the actual statutory effect, as well as the wisdom, of requiring notice to parents prior to the performance of these surgical procedures upon their minor daughters are certainly substantial and not without foundation, the choices between competing legislative designs are reserved for that branch of government. Once a court recognizes the narrowly tailored pursuit of a compelling state interest, a debate over the soundness of the legislatively chosen policy cannot control its constitutional outcome. Likewise, the simple identification of legislative inconsistencies cannot be the yardstick by which we evaluate the constitutionality of statutes. There is no question that the provisions of nearly every statute in existence reflect differing policy and theoretical judgments. The majority demands *667 legislative consistency, but fails to consider that many areas of Florida law do require parental involvement when minors are impacted. Driver's license provisions, see § 322.09, Fla. Stat. (2002), body piercing, see § 381.0075(7), Fla. Stat. (2002), possession and use of firearms, see § 790.22(1), (3), Fla. Stat. (2002), tattoos, see § 877.04(3), Fla. Stat. (2002), donation of blood, see 743.06, Fla. Stat. (2002), attendance at a parimutuel event, see § 550.0425(1), Fla. Stat. (2002), and even artificial sun tanning, see § 381.89(7), Fla. Stat. (2002), all require parental involvement.
The majority correctly relies upon T.W. as substantive support for its conclusion that the parental notification statute at issue today fails to qualify as the least restrictive means of accomplishing the state's recognized compelling interest in protecting the health and welfare of its minor citizens. However, T.W. itself turned almost entirely upon "the selective approach employed by the legislature" in determining that the parental consent statute at issue was unconstitutional. T.W., 551 So.2d at 1195. Thus, while today's majority disavows resolution of the instant case upon statutory inconsistency, it approves wholesale a trial court judgment and relies exclusively upon an opinion, both of which are almost entirely predicated upon the idea that statutory inconsistency evidences constitutional infirmity.
Finally, while the majority does not explicitly so state, it must be aware that the effect of today's decision is to prohibit the state from ever acting to protect the health and welfare of minors through involvement of parents in the reproductive arena. Today, the majority extends the limited ruling of T.W., that the state may not require parental consent prior to performance of abortive procedures, to preclude any legislatively-required parental participation in the myriad of decisions surrounding whether to have surgery to end a pregnancy. This conclusion is based upon the unavoidable realization that the procedure outlined in the statute before us today is probably the least restrictive method of ensuring parental supervision and engagement in decisions bearing upon the physical health and well-being of their pregnant child if parents are to have any involvement whatsoever. While the majority states that it recognizes the compelling state interest in safeguarding the physical welfare of minors through supporting the supervisory rights of parents, it prohibits the absolutely least intrusive means of realizing this interest. I can identify no valid, less intrusive method of ensuring parental involvement in these decisions of a child than that outlined in the statute before us. I cannot agree that T.W. should be extended to prohibit all state action in this field.
Based upon the forgoing, I can concur in the result only as being required by T.W., but agree with the First District Court of Appeal recognizing the primacy of the health, safety, and welfare of our children, and "the ability of parents and guardians to fulfill their duty to provide appropriate medical care for their daughters." N. Florida Women's Health & Counseling Servs., 852 So.2d at 262. I believe that the majority's conclusion that today's decision "in no way interferes with a parent's right to participate in the decisionmaking process" and that following today's decision, "parent and minor are free to do as they wish ... without governmental intrusion," majority op. at 615, is extraordinarily simplistic, naive, and contrary to logic. Without knowledge, parents simply cannot exercise their fundamental right and corresponding duty to safeguard the physical well being of their children. Parents are not free to do as *668 they wish to protect their children if the secrecy of strangers conceals necessary information. If it were not for T.W., I would conclude that the statute at issue serves the compelling interest of protecting the safety of children and also "serves the compelling state interest in securing inviolate the right of a mother and a father to rear their child as they see fit, and to participate fully in the child's life." Planned Parenthood of the Blue Ridge v. Camblos, 155 F.3d 352, 367 (4th Cir.1998). This is accomplished in the least intrusive manner possible, but is contrary to the legislative consistency standard established in T.W. and expanded upon today.
WELLS, J., dissenting.
I dissent from the decision of the majority. I believe the decision of the First District Court of Appeal should be approved.
My first and fundamental reason is that I simply recognize that there is a very real difference between parental consent, which was the subject of this Court's decision in In re T.W., 551 So.2d 1186 (Fla.1989), and parental notification, which is the subject of the statute in the present case. In what I conclude to be ultimately a policy decision, not a constitutional decision, I cannot join the majority in not deferring to the decision of the Legislature.
I do not agree with the majority's criticism of the district court's decision. The district court properly reviewed the case and set forth a well-reasoned analysis of the legal issues. In fact, I find that the majority's lengthy discussion concerning the standard of review and the opinion in Chiles v. State Employees Attorneys Guild, 734 So.2d 1030 (Fla.1999), to be in substantial part irrelevant.
The trial court's "Final Judgment Granting Permanent Injunction" states:
Since the Legislature set forth specific findings of fact in support of the Act, it seems appropriate to organize my analysis of the evidence around those findings. I am obliged to give them great weight. Even if I weren't, I find that I have little quarrel with what I consider to be the essence of these "findings of fact." For the most part, I find them fairly self evidentthough I think some clarification and additional findings of fact are important to the legal analysis here.
(Emphasis added.)
The final judgment continues:
The stated purposes for the Act follow logically from the legislative findings; e.g., protect minors from their own immaturity, preserve the family unit and parental authority, and prosecute sexual batteries against minors. I can't imagine any serious disagreement over the importance of these interests to our society. The family unit is the cornerstone of civilized society. We depend on parents to protect, guide, and socialize their children, to help make them law abiding, productive members of the community. We hold parents responsible for their childrenas we shouldand we should be about the business of helping them, certainly not hindering them, in carrying out this responsibility.
The issue though is not whether these interests and goals are worthy and important. They clearly are. The question is whether the challenged Act is permissible under our State Constitution to achieve them. For the reasons outlined below, I conclude that it is not.
(Emphasis added.) The trial court followed this with conclusions of law. My reading of this final judgment is that the trial court recognized that it was to accept the legislative findings and make a ruling of law. Of course, a trial court's ruling of *669 law is reviewed de novo by the court of appeal.
However, in view of the extensive discussion of Chiles, I will comment on that opinion. In Chiles, this Court, in an opinion which I authored, adopted the opinion and decision of the district court. In doing that, neither I nor the district court dealt with this Court's standard of review for the constitutionality of legislative acts which this Court expressly set out in University of Miami v. Echarte, 618 So.2d 189, 196 (Fla.1993).
Echarte was a case involving a fundamental right under the Florida Constitutionaccess to courts. See Kluger v. White, 281 So.2d 1 (Fla.1973). In Echarte, this Court held:
The Legislature has the final word on declarations of public policy, and the courts are bound to give great weight to legislative determinations of facts. See American Liberty Ins. Co. v. West & Conyers Architects & Engineers, 491 So.2d 573 (Fla. 2d DCA 1986). Further, legislative determinations of public purpose and facts are presumed correct and entitled to deference, unless clearly erroneous. See State v. Division of Bond Fin., 495 So.2d 183 (Fla.1986), and Miami Home Milk Producers Ass'n v. Milk Control Bd., 124 Fla. 797, 169 So. 541 (1936). Because the Legislature's factual and policy findings are presumed correct and there has been no showing that the findings in the instant case are clearly erroneous, we hold that the Legislature has shown that an "overpowering public necessity exists."
618 So.2d at 196-97 (emphasis added).
This Court followed and quoted this very statement in Westerheide v. State, 831 So.2d 93, 101 (Fla.2002), and further called approving attention to Moore v. Thompson, 126 So.2d 543, 549 (Fla.1960), in which this Court said:
Legislative findings and declarations of policy are presumed to be correct, but are not binding upon the courts under all conditions. The courts will abide by such legislative decisions unless such are clearly erroneous, arbitrary, or wholly unwarranted.

Moore, 126 So.2d at 549 (emphasis added). Therefore, to the extent that my opinion in Chiles did not follow Echarte, I was plainly wrong. Whatever doubt Chiles put on the standard set forth in Echarte was cleared by the readoption by this Court of that standard in Westerheide. Similarly, the majority's present analysis based upon Chiles, and not taking into account Echarte, is wrong. This long-standing, clearly erroneous standard makes compelling sense in our state, in which we have a constitutional commitment and mandate to a separation of powers between the three branches of government. Art. II, § 3, Florida Const. A single trial judge's determination of facts could not reasonably be substituted for the legislative branch's findings of fact on any lesser standard and honor the separation of powers. Although, I reiterate that here this analysis is all irrelevant in view of the trial court's acceptance of the legislative findings.
As to this Court's de novo review of whether the State has established a compelling state interest using the least intrusive means, I conclude that the State has met its burden. There is no basis for this Court to substitute judicial judgment for legislative judgment on this policy issue. When the appropriate deference is given to the legislative findings of fact, the issue reduces to whether there is a difference between parental consent and parental notification. The difference is patent, as has been recognized by substantial legal authority. The United States Supreme Court clearly recognized this difference by upholding a parental notification statute *670 against constitutional attack under the United States Constitution, stating:
Although we have held that a state may not constitutionally legislate a blanket, unreviewable power of parents to veto their daughter's abortion, a statute setting out a "mere requirement of parental notice" does not violate the constitutional rights of an immature, dependent minor.
H.L. v. Matheson, 450 U.S. 398, 409, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981). That Court then adopted language from its earlier decision in Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).
There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child.
H.L. v. Matheson, 450 U.S. at 409-10, 101 S.Ct. 1164. More recently, the Court upheld Montana's parental notification statute in Lambert v. Wicklund, 520 U.S. 292, 299, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997).
In accord with this reasoning, it is simply logical to me that the community, acting through the State, has an exceedingly compelling interest in having parents parent their children. Thus, the State has established a compelling interest in requiring parental responsibility for providing medical care, guidance, and counseling, particularly when a parent's child is in crisis. It is illogical to me, if the State has such a compelling interest in parental responsibility, to conclude that there is not a compelling interest in "notifying" the parent when the child is in a crisis situation. How can a parent be expected to act responsibly without notice? I fully concur with Justice Lewis's conclusion that "without knowledge, parents simply cannot exercise their fundamental right and corresponding duty to safeguard the physical well being of their children." Concurring in result only op. at 668. I also concur with Justice Lewis that the State has demonstrated that the parental notification statute accomplishes its goals using the least intrusive means.
I believe that it is this Court's obligation in ruling upon what the majority recognizes are "the most gut wrenching, emotion-laden issues of our day" in which there are "well-intentioned, civic-minded individuals on both sides of the debate," majority op. at 639, not to allow constitutional review to become a vehicle for substituting the judicial branch's judgment as to policy questions for the judgment of the legislative branch. Rather, this Court is obligated to adhere to the principle so well articulated at the outset of this nation by Chief Justice Marshall in Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810):
The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The Court, when compelled by duty to render such a judgment, would be unworthy of its station, if it were unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.
(Emphasis added.)
Dating to Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the power assumed by the judicial branch of *671 our government to declare acts of the Legislature unconstitutional has been acquiesced in by the legislative and executive branches on the representation that this judicial power will be used with restraint and only in the face of clear and compelling constitutional conflicts. In Greater Loretta Improvement Ass'n v. State ex rel. Boone, 234 So.2d 665, 670 (Fla.1970), this Court expressly stated:
When the Legislature has once construed the Constitution, for the courts then to place a different construction upon it means that they must declare void the action of the Legislature. It is no small matter for one branch of the government to annul the formal exercise by another of power committed to the latter. The courts should not and must not annul, as contrary to the Constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the Constitution. This is elementary.
In Capital City Country Club v. Tucker, 613 So.2d 448, 452 (Fla.1993), this Court stated: "If it is reasonably possible to do so, we are obligated to interpret statutes in such a manner as to uphold their constitutionality."
In the present case, we have a statute in a form which has been sustained by the United States Supreme Court against constitutional attack. We have a statute which differs from the statute stricken by a plurality of this Court in In re T.W. because it does not give the parent a "veto." We also have a unanimous decision from the First District Court of Appeal which held that the statute is constitutional.
In the present case, the Legislature has acted in a narrow way, and this Court should follow its precedent and give the proper deference to the Legislature's decision in enacting this statute. Upholding the Legislature's decision here does not conflict with In re T.W. because of the plain distinction between parental consent and parental notification as recognized by sound legal authority. The majority's reliance on In re T.W. for the idea that uniform application equates to compelling state interest ignores the fact that In re T.W. was a plurality opinion based on a readily distinguishable statute.
The majority lays great stress on following and then reaffirming In re T.W. The majority rejects as inaccurate the statements in other cases and in the district court below that there was not a majority opinion in In re T.W. Contrary to the majority opinion, however, the plain fact is that Justice Shaw's opinion was only fully concurred in by Justice Barkett and Justice Kogan. As to the precedential value of In re T.W., Justice Kogan later wrote:
I must express some surprise at the rather widespread practice in Florida of referring to a "majority opinion" in T.W. In actuality there was no "majority opinion" at all. The views of the Justices in T.W. were divided into five separate opinions, none of which garnered the four votes necessary to constitute a precedential "opinion" under the Florida Constitution. Art. V, § 3(a), Fla. Const.; Santos v. State, 629 So.2d 838 (Fla.1994).
Rather, the "decision"[n.] of T.W. may be fairly described as three general holdings on which a majority agreed, albeit in piecemeal form in five separate opinions: (a) All seven justices agreed that adult women have a right to terminate a pregnancy during the earlier stages, as described in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); (b) at least six justices agreed that Florida's parental consent statute read in its literal sense was unconstitutional, though two of the six felt that the *672 deficiencies properly could be corrected through a judicial narrowing construction; and (c) at least four Justicesand possibly all sevenagreed that minors do not share the same degree of privacy rights adults possess. T.W., 551 So.2d at 1186-1205 (separate opinions). Beyond these three points, there was no "majority" view.
[n.] We have noted elsewhere that a "decision" is the result or results approved by at least four members of the Court in a case. An "opinion," which is the analysis supporting a decision, can constitute precedent only to the extent at least four Justices have concurred in it. Santos v. State, 629 So.2d 838 (Fla.1994). It thus is possible for a case to result in a "decision" even if there is no "majority opinion," as happened in T.W.
The last of the three holdings of T.W. has gone unnoticed by a considerable number of persons, apparently because it was contained chiefly in the four separate opinions appended to the plurality.
Jones v. State, 640 So.2d 1084, 1091 (Kogan, J., concurring) (footnote omitted).
The majority's holding that In re T.W. controls the present case erroneously extends Justice Shaw's opinion in In re T.W. I believe that to so extend Justice Shaw's opinion in In re T.W. requires a reexamination of whether Florida's right to privacy was intended by its drafters to make rights in familial matters more extensive than the rights under the United States Constitution. In reviewing the intent of the drafters, I find that one commentator (who was a participant in drafting the state right to privacy) indicates that the drafters agreed during debates that the rights established by Florida's right to privacy were to be those protected by the United States Constitution, particularly regarding the right to abortion. See generally Jon Mills, Sex, Lies, and Genetic Testing: What are Your Rights to Privacy in Florida?, 48 Fla. L.Rev. 813 (1996).
Moreover, the plurality opinion in In re T.W. does not discuss an issue which is fundamental to Florida's right of privacy provisions"a reasonable expectation of privacy"which is a key part of this Court's opinion in Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 547 (Fla.1985). I believe this issue is of particular import in examining the minor's right in respect to her parents. In Stall v. State, 570 So.2d 257, 260 (Fla.1990), which came out one year after In re T.W., a majority of this Court stated:
Before the right of privacy attaches "a reasonable expectation of privacy must exist." Winfield, 477 So.2d at 547. Determining "whether an individual has a legitimate expectation of privacy in any given case must be made by considering all the circumstances, especially objective manifestations of that expectation." Shaktman v. State, 553 So.2d 148, 153 (Fla.1989) (Ehrlich, C.J., concurring, emphasis added).
As is explained by Justice Kogan's concurring opinion in Jones, a majority of this Court has recognized that minors do not have the same level of privacy rights that adults possess. See Jones, 640 So.2d at 1091 (Kogan, J., concurring). In respect to parental notification, the analysis of a minor's right to privacy should, in accord with this precedent, begin with the question of whether a minor has a reasonable expectation to keep knowledge of medical information from a parent. The legislative determination was that there is no such reasonable expectation to keep such information from a parent. That determination simply is not clearly erroneous, nor was it found to be by the trial court, nor could it be because it is plainly in keeping with common sense and experience.
Furthermore, before In re T.W. is to be extended, the legal analysis of the plurality opinion should also be reexamined as to its *673 use of legislative inconsistency as the basis upon which this Court determines whether there is a compelling state interest. First, my research reveals that legislative inconsistency as used in the plurality opinion in In re T.W. is not a deeply rooted or widely used doctrine of constitutional review. The In re T.W. opinion cites as authority for this approach Ivey v. Bacardi Imports Co., 541 So.2d 1129, 1139 (Fla.1989), which this Court issued the very same year as In re T.W. The Ivey opinion did not, however, address the right to privacy. Rather, it addressed the interstate commerce clause and state taxation of liquor. Second, as a doctrine of constitutional analysis, I find legislative consistency as it was used in Justice Shaw's opinion in In re T.W. to be highly questionable as a sole basis for finding a statute unconstitutional. This Court or any court can without difficulty identify statutes which are inconsistent for various reasons. The legislative branch enacts legislation on a wide variety of matters, and there is no way that all legislation on particular subjects is going to meet this exacting test of consistency. In addition, if the judicial branch holds legislation unconstitutional because it does not meet judicial scrutiny for consistency, then there is a real likelihood that legislators will change good and effective statutes merely to avoid this Court's voiding statutes based on legislative inconsistency. It would be an unfortunate consequence of the present majority decision if the Legislature changes section 384.30(1) or 743.065(1), Florida Statutes (1999), in reaction to this majority's holding that the parental notification statute is unconstitutional because of legislative inconsistency.
It appears to me that a more logical constitutional analysis of legislation regarding minors' rights in respect to their parents would be to accept that the State has a compelling interest in the health and welfare of minors. This Court should then use the analysis provided by United States Supreme Court Justices O'Connor, Kennedy, and Souter in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), which was released three years after In re T.W. In Casey, 505 U.S. at 876, 112 S.Ct. 2791, they recognized that the strict scrutiny test (which is almost always fatal in fact) was not the appropriate standard for addressing regulation of the right to abortion:
The very notion that the State has a substantial interest in potential life leads to the conclusion that not all regulations must be deemed unwarranted. Not all burdens on the right to decide whether to terminate a pregnancy will be undue. In our view, the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty.
This analysis has been adopted by a majority of the United States Supreme Court as the appropriate analysis for addressing the multiple compelling interests involved when the State regulates the right to abortion. See, e.g., Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). Using this analysis rather than the rigid "compelling state interest" standard not only eliminates the inherent problems with the judiciary using legislative inconsistency as a basis for holding a statute unconstitutional, but this analysis logically addresses the real constitutional question, which is whether the Legislature by its statute unduly burdened a minor's right to privacy. When this analysis is used, the answer is plain that a statute requiring notice to a parent cannot be an undue burden on the minor's right to privacy, given the fact that a minor has at most a limited reasonable expectation of privacy in respect to the minor's parent and the fact that a parent has a fundamental *674 right in parenting the child. Rather than recognizing that many interests may be served by the parental notification statute, the majority uses an untenable analysis to weigh the value of the statute against a single interest so as to render the statute unconstitutional. The majority's attempt to rationalize its adherence to strict scrutiny is illogical and appears to me to be but a rationalization for adhering to In re T.W., which the majority concludes can support the result the majority seeks.
Finally, also in Stall, the majority of this Court adopted the following statement from Justice Grimes' opinion in In re T.W.:
Practically any law interferes in some manner with someone's right of privacy. The difficulty lies in deciding the proper balance between this right and the legitimate interest of the state. As the representative of the people, the legislature is charged with the responsibility of deciding where to draw the line. Only when that decision clearly transgresses private rights should the courts interfere.

Stall, 570 So.2d at 261 (quoting In re T.W., 551 So.2d at 1204 (Grimes, J., concurring in part, dissenting in part)) (emphasis added). I believe that the majority errs by concluding that the parental notification statute is a legislative decision that transgresses private rights to the extent that requires this Court to interfere. The decision of the First District Court of Appeal should be approved.
Finally, I have a concern about the length of time that the operation of this statute has been enjoined without a final determination of the statute's constitutionality. My concern is directed to the unlimited stay which was granted by the district court. As I have written in other contexts, I am opposed to courts entering unlimited stays separate and apart from rulings on the merits. My opposition is based upon such unlimited stays becoming perpetual stays with the effect being that the stay becomes a merits ruling.
This is of particular concern to me when a stay keeps a legislative enactment from becoming effective. I believe that our procedure should expedite consideration of these cases. Our procedure should also be that the lower court should only stay the mandate in its court for the period of time allowed to appeal its decision to the higher court. This places the direct responsibility for the stay in the court that has the case under consideration.
I recommend that the procedures for stays of mandate be reviewed by our various rules committees.
NOTES
[1] See Planned Parenthood v. Farmer, 165 N.J. 609, 762 A.2d 620 (2000) (holding unconstitutional a New Jersey parental notification of abortion statute).
[2] See art. V, § 3(b)(3), Fla. Const.
[3] Several amici curiae have filed legal briefs in support of the Florida Attorney General. We hereinafter refer to the Attorney General and amici collectively as "the State."
[4] Jamie Sabino is an adjunct professor at Boston University; she is a family law attorney and guardian ad litem in domestic relations and child dependency cases. Dr. Benjamin practices obstetrics and gynecology in Florida. Judge Martin is a district court judge in Duluth, Minnesota. Dr. Henshaw is a sociologist who trained at Harvard University and Columbia University. Dr. Alder, who testified via telephone, is vice chair of the Department of Psychiatry at the University of California, San Francisco. Dr. Krop is a clinical psychologist who practices in Florida.
[5] Dr. Moorhead practices obstetrics and gynecology in Florida. Dr. Uhlenberg is a professor of sociology at the University of North Carolina. Dr. Elkind is a professor of child development at Tufts University. Dr. Figley is a professor of family psychology at Florida State University.
[6] See, e.g, Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998) (addressing the visitation rights of grandparents when a child's parent is deceased); J.A.S. v. State, 705 So.2d 1381 (Fla. 1998) (addressing a statutory rape law as applied to particular defendants); Krischer v. McIver, 697 So.2d 97 (Fla.1997) (addressing assisted suicide); Beagle v. Beagle, 678 So.2d 1271 (Fla.1996) (addressing the visitation rights of grandparents when a child's parents are living together); In re Dubreuil, 629 So.2d 819 (Fla.1994) (addressing a patient's right to refuse a blood transfusion for religious reasons, where the patient is the parent of four minor children); In re Guardianship of Browning, 568 So.2d 4 (Fla.1990) (addressing whether a surrogate may exercise an incompetent patient's right to decline medical treatment); In re T.W., 551 So.2d 1186 (Fla.1989) (addressing parental consent for a minor to obtain an abortion); Public Health Trust v. Wons, 541 So.2d 96 (Fla.1989) (addressing a patient's right to refuse a life-sustaining blood transfusion); Barron v. Florida Freedom Newspapers, Inc., 531 So.2d 113 (Fla.1988) (addressing the closure of court proceedings and records); Rasmussen v. S. Fla. Blood Serv., 500 So.2d 533 (Fla.1987) (addressing the confidentiality of donor information concerning an AIDS-tainted blood supply); Winfield v. Div. of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985) (addressing the confidentiality of bank records); Corbett v. D'Alessandro, 487 So.2d 368 (Fla. 2d DCA), review denied, 492 So.2d 1331 (Fla.1986) (addressing the removal of a nasogastic feeding tube from an adult in a permanent vegetative state). Cf. Renee B. v. Fla. Agency for Health Care Admin., 790 So.2d 1036 (Fla.2001) (holding that the right of privacy was not implicated by agency rules that barred public funding for abortions); City of N. Miami v. Kurtz, 653 So.2d 1025 (Fla.1995) (holding that the right of privacy was not implicated by an administrative regulation that required all job applicants to sign an affidavit stating they have not used tobacco products during the preceding year).
[7] See Fla. S. Comm. on Health, Aging and Long-Term Care, SB1598 (1999), Staff Analysis (revised April 6, 1999) (available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[8] See Meeting of Fla. S. Comm. on Health, Aging and Long-Term Care (April 6, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[9] See Fla. S. Comm. on Judiciary, CS/SB 1598 (1999), Staff Analysis (final April 15, 1999) (available at Fla. Dep't of State, Bureau of Archives and Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[10] The staff analysis and economic impact statement issued by the Senate Judiciary Committee provided as follows in relevant part:

The bill may raise some constitutional issues as to whether the 48-hour parental notification-and-waiting period can satisfy the "compelling state interest" as reviewed under Florida's express constitutional right of privacy provision. Based on the state legislative findings and intent, it appears that two of the state interests are designed to protect the immature minor and preserve the family unit. In ruling that a parental consent statute was unconstitutional in 1989, the Florida Supreme Court stated that "neither of these interests is sufficiently compelling under Florida law to override Florida's privacy amendment." See In re T.W., 551 So.2d 1186 (1989).
Fla. S. Judiciary Comm., CS/SB1598 (1999), Staff Analysis 8 (April 15, 1999) (emphasis omitted and added) (available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[11] See Meeting of Fla. S. Judiciary Comm. (April 15, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[12] The Legislature passed the Committee Substitute for Senate Bill 1598. See ch. 99-322, § 1, Laws of Fla.
[13] The Parental Notice of Abortion Act, as codified in section 390.01115, Florida Statutes (1999), provides as follows:

390.01115 Parental Notice of Abortion Act.
(1) SHORT TITLE.This section may be cited as the "Parental Notice of Abortion Act."
(2) DEFINITIONS.As used in this section, the term:
(a) "Actual notice" means notice that is given directly, in person, or by telephone.
(b) "Child abuse" has the meaning ascribed in s. 39.0015(3) and refers to the acts of child abuse against a minor by a family member as defined in s. 741.28(2).
(c) "Constructive notice" means notice that is given by certified mail to the last known address of the parent or legal guardian of a minor, with delivery deemed to have occurred 48 hours after the certified notice is mailed.
(d) "Medical emergency" means a condition that, on the basis of a physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate termination of her pregnancy to avert her death, or for which a delay in the termination of her pregnancy will create serious risk of substantial and irreversible impairment of a major bodily function.
(e) "Sexual abuse" has the meaning ascribed in s. 39.01 and refers to the acts of sexual abuse against a minor by a family member as defined in s. 741.28(2).
(3) NOTIFICATION REQUIRED.
(a) A termination of pregnancy may not be performed or induced upon a minor unless the physician performing or inducing the termination of pregnancy has given at least 48 hours' actual notice to one parent or to the legal guardian of the pregnant minor of his or her intention to perform or induce the termination of pregnancy. The notice may be given by a referring physician. The physician who performs the termination of pregnancy must receive the written statement of the referring physician certifying that the referring physician has given notice. If actual notice is not possible after a reasonable effort has been made, the physician or his or her agent must give 48 hours' constructive notice.
(b) Notice is not required if:
1. A medical emergency exists and there is insufficient time for the attending physician to comply with the notification requirements. If a medical emergency exists, the physician may proceed but must document reasons for the medical necessity in the patient's medical records;
2. Notice is waived in writing by the person who is entitled to notice;
3. Notice is waived by the minor who is or has been married or has had the disability of nonage removed under s. 743.015 or a similar statute of another state;
4. Notice is waived by the patient because the patient has a minor child dependent on her; or
5. Notice is waived under subsection (4).
(c) Violation of this subsection by a physician constitutes grounds for disciplinary action under s. 458.331 or s. 459.015.
(4) PROCEDURE FOR JUDICIAL WAIVER OF NOTICE.
(a) A minor may petition any circuit court for a waiver of the notice requirements of subsection (3) and may participate in proceedings on her own behalf. The petition must include a statement that the petitioner is pregnant and notice has not been waived. The court may appoint a guardian ad litem for her. A guardian ad litem appointed under this subsection shall act to maintain the confidentiality of the proceedings. The circuit court shall advise the minor that she has a right to court-appointed counsel and shall provide her with counsel upon her request.
(b) Court proceedings under this subsection must be given precedence over other pending matters to the extent necessary to ensure that the court reaches a decision promptly. The court shall rule, and issue written findings of fact and conclusions of law, within 48 hours after the petition is filed, except that the 48-hour limitation may be extended at the request of the minor. If the court fails to rule within the 48-hour period and an extension has not been requested, the petition is granted, and the notice requirement is waived.
(c) If the court finds, by clear evidence, that the minor is sufficiently mature to decide whether to terminate her pregnancy, the court shall issue an order authorizing the minor to consent to the performance or inducement of a termination of pregnancy without the notification of a parent or guardian. If the court does not make the finding specified in this paragraph or paragraph (d), it must dismiss the petition.
(d) If the court finds, by clear evidence, that there is evidence of child abuse or sexual abuse of the petitioner by one or both of her parents or her guardian, or that the notification of a parent or guardian is not in the best interest of the petitioner, the court shall issue an order authorizing the minor to consent to the performance or inducement of a termination of pregnancy without the notification of a parent or guardian. If the court does not make the finding specified in this paragraph or paragraph (c), it must dismiss the petition.
(e) A court that conducts proceedings under this section shall provide for a written transcript of all testimony and proceedings and issue written and specific factual findings and legal conclusions supporting its decision and shall order that a confidential record of the evidence and the judge's findings and conclusions be maintained. At the hearing, the court shall hear evidence relating to the emotional development, maturity, intellect, and understanding of the minor.
(f) An expedited confidential appeal shall be available, as the Supreme Court provides by rule, to any minor to whom the circuit court denies a waiver of notice. An order authorizing a termination of pregnancy without notice is not subject to appeal.
(g) No filing fees or court costs shall be required of any pregnant minor who petitions a court for a waiver of parental notification under this subsection at either the trial or the appellate level.
(h) No county shall be obligated to pay the salaries, costs, or expenses of any counsel appointed by the court under this subsection.
§ 390.01115, Fla. Stat. (1999).
[14] Under "ordinary" scrutiny, which applies to most legislation, a court must review the legislation to ensure that it bears a reasonable relationship to a legitimate State interest. The legislation is presumptively constitutional. The standard of proof is as follows: the challenging party must prove that the legislation does not bear a reasonable relationship to a legitimate State interest. See generally Pinillos v. Cedars of Lebanon Hosp. Corp., 403 So.2d 365 (Fla.1981).
[15] Under "mid-level" scrutiny, which applies inter alia to certain types of speech and classifications, a court must review the legislation to ensure that it is substantially related to an important government interest. The legislation is presumptively unconstitutional. The standard of proof is as follows: the State must prove that the legislation is substantially related to an important government interest. See generally T.M. v. State, 784 So.2d 442, 443 n. 1 (Fla.2001).
[16] Under "strict" scrutiny, which applies inter alia to certain classifications and fundamental rights, a court must review the legislation to ensure that it furthers a compelling State interest through the least intrusive means. The legislation is presumptively unconstitutional. The standard of proof is as follows: the State must prove that the legislation furthers a compelling State interest through the least intrusive means. See generally In re T.W., 551 So.2d 1186, 1193 (Fla. 1989).
[17] See supra notes 14-16.
[18] See also Capital City Country Club, Inc. v. Tucker, 613 So.2d 448, 452 (Fla.1993).
[19] See also City of Mobile v. Bolden, 466 U.S. 55, 76, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) ("It is of course true that a law that impinges upon a fundamental right explicitly or implicitly secured by the Constitution is presumptively unconstitutional.").
[20] See generally State v. Glatzmayer, 789 So.2d 297, 301 & n.7 (Fla.2001).
[21] See, e.g., Cox v. Fla. Dep't of Health & Rehab. Servs., 656 So.2d 902 (Fla.1995); State Employees Attorneys Guild v. State, 653 So.2d 487 (Fla. 1st DCA 1995).
[22] See State Employees Attorneys Guild v. State, 653 So.2d 487 (Fla. 1st DCA 1995).
[23] See, e.g., Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998); Krischer v. McIver, 697 So.2d 97 (Fla.1997); Beagle v. Beagle, 678 So.2d 1271 (Fla.1996); In re Dubreuil, 629 So.2d 819 (Fla.1993); In re Guardianship of Browning, 568 So.2d 4 (Fla.1990).
[24] See, e.g., Chiles v. State Employees Attorneys Guild, 734 So.2d 1030 (Fla.1999).
[25] See, e.g., Coy v. Fla. Birth-Related Neurological Injury Comp. Plan, 595 So.2d 943 (Fla. 1992). To the extent that language in Chiles v. State Employees Attorneys Guild, 734 So.2d 1030, 1034 (Fla.1999), may be read as endorsing use of the "clearly erroneous" standard in this regard, we recede from that language.
[26] See art. II, § 3, Fla. Const.
[27] See Chiles, 734 So.2d at 1034 (quoting Chiles, 714 So.2d at 506); see also Pinillos v. Cedars of Lebanon Hosp. Corp., 403 So.2d 365, 369 (Fla.1981) (Sundberg, C.J., dissenting) ("[T]his Court ... is not bound by whatever preamble the legislature decides to attach to justify a statute.").
[28] The legislative record is silent as to the preliminary form of the bill and as to whether it was prepared by the sponsor, a constituent, or a lobbyist. As a rule, bills are submitted to the drafting service in outline form; the actual writing of bills is left to the staff of the drafting service. See generally Allen Morris, The Florida Handbook 113 (28th ed.2001).
[29] The bill, as ultimately passed by the Legislature, was prefaced by nine "whereas" clauses. All those clauses were present in the bill that emerged from the Senate bill drafting service except for the eighth clause, which was introduced by the bill's sponsor and adopted during the floor debate after the bill was reported out of the Judiciary Committee. The preamble to the bill that was passed by the Legislature provided as follows:

WHEREAS, immature minors often lack the ability to make informed choices that take into account both immediate and long-range consequences, and
WHEREAS, the unique medical, emotional and psychological consequences of abortion are sometimes serious and can be lasting, particularly when the patient is immature, and
WHEREAS, the capacity to become pregnant and the capacity for mature judgment concerning the wisdom of an abortion are not necessarily related, and
WHEREAS, parents ordinarily possess information essential to a physician's exercise of his or her best medical judgment concerning the child, and
WHEREAS, parents who are aware that their minor daughter has had an abortion may better ensure that she receives adequate medical attention after her abortion, and
WHEREAS, parental consultation is usually desirable and in the best interests of the minor, and
WHEREAS, the Legislature's purpose in enacting parental notice legislation is to further the important and compelling state interests of protecting minors against their own immaturity, fostering family unity and preserving the family as a viable social unit, protecting the constitutional rights of parents to rear children who are members of their household, and reducing teenage pregnancy and unnecessary abortion, and
WHEREAS, further legislative purposes are to ensure that parents are able to meet their high duty to seek out and follow medical advice pertaining to their children, stay apprised of the medical needs and physical condition of their children, and recognize complications that might arise following medical procedures or services, to preserve the right of parents to pursue a civil action on behalf of their child before expiration of the statute of limitations if a facility or physician commits medical malpractice that results in injury to a child, and to prevent, detect, and prosecute batteries, rapes and other crimes committed upon minors, and
WHEREAS, previous legislation requiring the consent of parents before a physician performed an abortion on their daughter was struck down by the Florida Supreme Court on the basis of the constitutional right of privacy, in the case of In Re: T.W., and this legislation is designed to extend the protection of the law to minor girls and their parents in accordance with the State Constitution....
Fla. CS for SB 1598 (1999) (First Engrossed).
[30] See generally Allen Morris, The Florida Handbook 113 (28th ed.2001).
[31] See Meeting of Fla. S. Comm. on Health, Aging and Long-Term Care (April 6, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.); and Meeting of Fla. S. Judiciary Comm. (April 15, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[32] The following witnesses testified at the first hearing for the following periods of time (which are approximate): Charlene Carres, a registered lobbyist with the Florida Coalition of Independent Abortion Providers, testified against the bill (four minutes, twenty-one seconds); Dr. Angela Woodhull, author of an anti-abortion publication, testified in favor of the bill (four minutes, fifty-one seconds); Renee Mitchell, an employee of an abortion clinic in Tallahassee, Florida, testified against the bill (three minutes, two seconds); and Cathy Boyer, a mother of two young daughters, testified in favor of the bill (two minutes, thirty-nine seconds). None of the witnesses were questioned by committee members except Charlene Carres, who was asked several questions by the bill's sponsor and two other senators (nine minutes, thirty-nine seconds). See Meeting of Fla. S. Comm. on Health, Aging and Long-Term Care (April 6, 1999) (Committee Appearance Record and tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[33] Of the six witnesses who were scheduled to testify at the second hearing, two declined to testify. The following witnesses testified for the following periods of time (which are approximate): Gigi Beard, who is affiliated with the Feminist Women's Health Center in Tallahassee, Florida, testified against the bill (thirty-three seconds); Lenora Weaver, who also is affiliated with the Feminist Women's Health Center, testified against the bill (one minute, four seconds); Charlene Carres, a registered lobbyist noted above, testified against the bill (two minutes, nine seconds); and Carol Griffin, who is associated with the Eagle Forum, testified in favor of the bill (fifty-nine seconds). None of the witnesses were questioned by committee members. See Meeting of Fla. S. Judiciary Comm. (April 15, 1999) (Committee Appearance Record and tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[34] See Meeting of Fla. S. Comm. on Health, Aging and Long-Term Care (April 6, 1999) (Committee Appearance Record and tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.); Meeting of Fla. S. Judiciary Comm. (April 15, 1999) (Committee Appearance Record and tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[35] See Meeting of Fla. S. Comm. on Health, Aging and Long-Term Care (April 6, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.); and Meeting of Fla. S. Judiciary Comm. (April 15, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[36] See id.
[37] As noted above, Charlene Carres, at the first hearing, was asked several questions by the bill's sponsor and two other senators (nine minutes, thirty-nine seconds). See Meeting of Fla. S. Comm. on Health, Aging and Long-Term Care (April 6, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[38] See Meeting of Fla. S. Comm. on Health, Aging and Long-Term Care (April 6, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.); and Meeting of Fla. S. Judiciary Comm. (April 15, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.).
[39] See id.
[40] See Fla. S., tape recording of proceedings (April 29, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.) (debating of bill, reading of bill, and voting on bill); Fla. H.R., tape recording of proceedings (April 30, 1999) (tape available at Fla. Dep't of State, Bureau of Archives & Records Mgmt., Fla. St. Archives, Tallahassee, Fla.) (debating of bill, reading of bill, voting on bill).
[41] See id.
[42] See ch. 90, Fla. Stat. (1999).
[43] Chiles, 734 So.2d at 1034.
[44] See In re T.W., 551 So.2d at 1193.
[45] See, e.g., Lambert v. Wicklund, 520 U.S. 292, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997); Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990); H.L. v. Matheson, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981).
[46] Under the "undue burden" standard, a government regulation cannot have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. See Planned Parenthood v. Casey, 505 U.S. 833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).
[47] See Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
[48] See In re T.W., 551 So.2d at 1190.
[49] See Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
[50] See generally Traylor v. State, 596 So.2d 957 (Fla.1992).
[51] See, e.g., Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).
[52] See, e.g., Winfield v. Div. of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985).
[53] See, e.g, Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998) (applying the strict scrutiny standard in addressing the visitation rights of grandparents when a child's parent is deceased); J.A.S. v. State, 705 So.2d 1381 (Fla. 1998) (applying the strict scrutiny standard in addressing a statutory rape law as applied to particular defendants); Krischer v. McIver, 697 So.2d 97 (Fla.1997) (applying the strict scrutiny standard in addressing assisted suicide); Beagle v. Beagle, 678 So.2d 1271 (Fla. 1996) (applying the strict scrutiny standard in addressing the visitation rights of grandparents when a child's parents are living together); B.B. v. State, 659 So.2d 256 (Fla.1995) (applying the strict scrutiny standard in addressing a statutory rape law as applied to a particular defendant); Jones v. State, 640 So.2d 1084 (Fla.1994) (applying the strict scrutiny standard in addressing a statutory rape law as applied to particular defendants); In re Dubreuil, 629 So.2d 819 (Fla.1993) (applying the strict scrutiny standard in addressing a patient's right to refuse a blood transfusion for religious reasons, where the patient is the parent of four minor children); In re Guardianship of Browning, 568 So.2d 4 (Fla. 1990) (applying the strict scrutiny standard in addressing whether a surrogate may exercise an incompetent patient's right to decline medical treatment); In re T.W., 551 So.2d 1186 (Fla.1989) (applying the strict scrutiny standard in addressing parental consent for a minor to obtain an abortion); Public Health Trust v. Wons, 541 So.2d 96 (Fla.1989) (applying the strict scrutiny standard in addressing a patient's right to refuse a life-sustaining blood transfusion); Winfield v. Div. of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985) (applying the strict scrutiny standard in addressing the confidentiality of bank records). Cf. Renee B. v. Fla. Agency for Health Care Admin., 790 So.2d 1036 (Fla.2001) (declining to apply the strict scrutiny standard after determining that the right to privacy was not implicated by agency rules that barred public funding for abortions); City of N. Miami v. Kurtz, 653 So.2d 1025 (Fla.1995) (declining to apply strict the scrutiny standard after determining that a plaintiff's reasonable expectation of privacy was not implicated by an administrative regulation that required all job applicants to sign an affidavit stating they had not used tobacco products during the preceding year).
[54] See, e.g., Santos v. State, 629 So.2d 838 (Fla.1994).
[55] See, e.g., Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998) (declaring unconstitutional a statute mandating visitation rights for a child's grandparents); J.A.S. v. State, 705 So.2d 1381 (Fla.1998) (declaring constitutional a statutory rape law as applied to two fifteen-year-old boys who had sex with two twelve year old girls); Krischer v. McIver, 697 So.2d 97 (Fla. 1997) (declaring constitutional a statute barring assisted suicide); B.B. v. State, 659 So.2d 256 (Fla.1995) (declaring unconstitutional a statutory rape law as applied to a sixteen year old boy who had sex with a sixteen-year-old girl); Jones v. State, 640 So.2d 1084 (Fla. 1994) (declaring constitutional a statutory rape law as applied to three men aged eighteen, nineteen, and twenty who had sex with minor girls); In re Dubreuil, 629 So.2d 819 (Fla.1994) (quashing a district court decision which held that a married but separated woman who chose not to receive a blood transfusion for religious reasons could be compelled to receive medical treatment); Stall v. State, 570 So.2d 257 (Fla.1990) (upholding the constitutionality of Florida's obscenity statute); In re Guardianship of Browning, 568 So.2d 4 (Fla.1990) (holding that a surrogate may exercise an incompetent patient's right to decline medical treatment if the patient expressed that intention while competent).
[56] See Jones, 640 So.2d at 1092 (showing no members of the Court joining in Justice Kogan's concurring opinion).
[57] See generally § 2.01, Fla. Stat. (1999).
[58] See Tyson v. Mattair, 8 Fla. 107 (1858).
[59] See, e.g., State v. Schopp, 653 So.2d 1016 (Fla.1995) (Harding, J., dissenting); Perez v. State, 620 So.2d 1256 (Fla.1993) (Overton, J., concurring).
[60] See State v. Gray, 654 So.2d 552, 554 (Fla. 1995) ("The legal fictions required to support the intent for felony murder are simply too great.").
[61] See supra note 55.
[62] See, e.g., Am. Acad. of Pediatrics v. Lungren, 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797 (1997).
[63] See, e.g., Planned Parenthood v. Casey, 505 U.S. 833, 860, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("[A]dvances in maternal health care allow for abortions safe to the mother later in pregnancy than was true in 1973 ... and advances in neonatal care have advanced viability to a point somewhat earlier.").
[64] See In re T.W., 551 So.2d at 1193.
[65] See id. at 1194.
[66] See, e.g., Hancock v. Sapp, 225 So.2d 411 (Fla.1969).
[67] In In re T.W., this Court said: "The Florida Constitution embodies the principle that `[f]ew decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision ... whether to end her pregnancy. A woman's right to make that choice freely is fundamental.'" In re T.W., 551 So.2d at 1193. This Court continued: "The next question to be addressed is whether this freedom of choice concerning abortion extends to minors. We conclude that it does, based on the unambiguous language of the amendment: The right of privacy extends to `[e]very natural person.'" In re T.W., 551 So.2d at 1193.
[68] This Court said: "Common sense dictates that a minor's rights are not absolute; in order to overcome these constitutional rights, a statute must survive the stringent test announced in Winfield: The state must prove that the statute furthers a compelling state interest through the least intrusive means." T.W., 551 So.2d at 1193.

That the forced notice provisions involved herein constitute an invasion of privacy has not been challenged. Indeed, they could not be. As Justice Lewis has noted, no one disputes that any similar intrusion on an adult woman's privacy would not be constitutionally permissible. In other words, there is no question that this scheme directly violates the expectant mother's privacy. The only question is whether the privacy violation is permissible because the expectant mother is a minor and not an adult.
[69] Indeed, the government has provided for no parental involvement in numerous other serious health care decisions, including a teenager's medical care for a pregnancy (other than termination), for birth of the teenager's child, for adoption of the teenager's child, for treatment of the teenager for sexually transmitted diseases such as AIDS, or for a host of other important medical issues, many fraught with far more danger than a termination of pregnancy.
[70] The concern expressed in Justice Lewis's opinion, that even in the face of a compelling state interest, parental or judicial involvement would never be appropriate, inaccurately depicts my analysis. As noted above, in my view, the chief reason that the act fails to satisfy a compelling state interest analysis is the inconsistent treatment between a minor's termination of pregnancy (where parental involvement is required), and other serious health care choices (where a minor is allowed to proceed without parental involvement). However, I do not suggest that, if the State establishes a compelling state interest which is evidenced by consistency in legislative treatment of a minor's serious health care decisions, the requirement of least intrusive means could never be satisfied via some form of parental involvement. That is an issue for another day.
[71] In addition, the trial court has pointed out, and other states have demonstrated by the actual enactment of less intrusive alternative legislation, that schemes do exist that are less intrusive on a minor's privacy rights and that more carefully balance the government's interest in the health and well being of minors and the minor's right to privacy.
[72] There is also an intermediate level of scrutiny, generally applicable to commercial speech and certain types of classifications, that requires that the State establish an important governmental objective and that the challenged statute bears a substantial relationship to that objective. See generally, State v. Bradford, 787 So.2d 811 (Fla.2001); T.M. v. State, 784 So.2d 442, 444 n. 1 (Fla.2001); Amendments to Rules Regulating the Florida Bar-Advertising Rules, 762 So.2d 392, 396 (Fla.1999); State Dep't of Health & Rehabilitative Servs. ex rel. Gillespie v. West, 378 So.2d 1220, 1224-25 (Fla.1979).
[73] A suspect class is any group that has been the traditional target of irrational, unfair, and unlawful discrimination. See Coy v. Florida Birth-Related Neurological Injury Compensation Plan, 595 So.2d 943, 945 (Fla.1992). This Court has determined that classifications based on alienage, nationality, or race are inherently suspect and subject to close judicial scrutiny. See Graham v. Ramani, 383 So.2d 634, 635 (Fla.1980).
[74] In my view, Justice Wells' reliance on this Court's decision in University of Miami v. Echarte, 618 So.2d 189, 196 (Fla.1993), rather than Chiles, is misplaced. See dissenting op. at 669. First, in Echarte, the trial court made no findings of fact because the issue was decided on summary judgment. Thus, the deference we gave to the Legislature in Echarte is not applicable to the present situation, in which the trial judge made factual findings after an extensive trial.

Second, in Echarte, the Legislature relied on recommendations and a study by an Academic Task Force as the basis for its legislative findings of fact. In contrast, as noted by the majority, the Legislature's statements of "policy" in this case are not supported by any fact finding.
Finally, Echarte is not a strict scrutiny case in the traditional sense. Echarte was analyzed under a standard of review developed by this Court to specifically address statutes that infringe on access to the courts. See Kluger v. White, 281 So.2d 1 (Fla.1973). The inapplicability of Echarte to strict scrutiny is emphasized by the fact that Echarte has not been cited in a strict scrutiny case, nor have there been any cases from this Court specifically applying a strict scrutiny standard that adopt Echarte's deferential language. To the extent that any conflict regarding the appropriate level of deference to the Legislature in fundamental rights cases is exhibited in our decisions in Chiles and Echarte, in my view it is Chiles, not Echarte, that is more consistent with this Court's jurisprudence in privacy cases.
[75] Although caselaw from this Court applying the strict scrutiny standard articulates the first prong of the strict scrutiny review as a single inquiry, see, e.g., T.W., 551 So.2d at 1193; Von Eiff v. Azicri, 720 So.2d 510 (Fla. 1998), in reality the first prong involves two interrelated inquiries: (a) whether the State has carried its "heavy" burden of establishing a compelling interest; and (b) whether the State has carried its "heavy" burden of establishing that the statutory scheme in fact serves or furthers that compelling state interest.
[76] The Legislature also identified the following purposes in enacting the parental notification statute, but did not label them as "important and compelling" state interests:

[F]urther legislative purposes are to ensure that parents are able to meet their high duty to seek out and follow medical advice pertaining to their children, stay apprised of medical needs and physical condition of their children, and recognize complications that might arise following medical procedures or services....
Ch. 99-322, Laws of Fla.
[77] The State's interest in appropriate aftercare is different from assuring "that parents have information concerning, and knowledge of, any medical or surgical care, treatment, or procedures to be performed upon their children"an interest that Justice Lewis finds compelling. Concurring in result only op. at 665. Further, Justice Lewis's concern applies broadly to medical care for any pregnancy-related condition, not merely the abortion procedure targeted by the notification law and protected by our constitutional right of privacy. Thus, although I agree with Justice Lewis that parents have an interest in their children's welfare before, during, and after medical or surgical procedures, the State has not established that this interest is different for abortion than for the other pregnancy-related conditions.
[78] Even assuming that the Legislature had made contrary factual findings based on testimony and an extensive factual record, I note that these findings would not be determinative of the outcome in this case. Rather, the Legislature's findings would merely be one factor for this Court to consider when conducting its overall strict scrutiny review.
[79] In response to Justice Wells' observation that "there is no way that all legislation on particular subjects is going to meet this exacting test of consistency," dissenting op. at 673, I note that we have at least twice relied on legislative consistency in upholding statutes against claims of invasion of minors' privacy under strict scrutiny analysis. See Jones v. State, 640 So.2d 1084, 1085 (Fla.1994) ("As evidenced by the number and breadth of the statutes concerning minors and sexual exploitation, the Florida Legislature has established an unquestionably strong policy interest in protecting minors from harmful sexual conduct."); J.A.S. v. State, 705 So.2d 1381, 1386 (Fla.1998) ("[O]ur reasoning in Jones is equally applicable here in recognizing the State's compelling interest in protecting twelve-year-olds from older teenagers and from their own immaturity in choosing to participate in harmful activity."). Thus, Justice Wells' concern that legislation will be unable to meet the "exacting test" of legislative consistency is belied by our own precedent.
[80] The State argues that under the precedent of this Court and the United States Supreme Court, the State's only obligation under the underinclusiveness inquiry is to offer a "reasonable basis for the legislative distinctions that are inherent in the difficult task of setting public policy." In support of this argument the State relies on the United States Supreme Court's decision in Williamson v. Lee Optical, 348 U.S. 483, 487-88, 75 S.Ct. 461, 99 L.Ed. 563 (1955), and this Court's decisions in In re Gainer, 466 So.2d 1055, 1059 (Fla.1985), and United Yacht Brokers, Inc. v. Gillespie, 377 So.2d 668, 671 (Fla.1979). However, these cases involve review of statutes where fundamental rights are not involved. Under the rational basis standard, the Legislature has broad discretion in formulating classifications as long as the classifications are reasonable. The test applied when no fundamental rights are at stake is whether the statute bears "a reasonable relation to a permissible legislative objective" and is not "discriminatory, arbitrary or oppressive." United Yacht Brokers, 377 So.2d at 671.
[81] To the extent that Justice Lewis bases his opinion on cases from this State that have recognized the "parental right and duty to be involved in guiding and protecting one's child... [and] to `provide reasonable and necessary medical attention for his [or her] child,'" concurring in result only op. at 662 (quoting DeCosta v. N. Broward Hosp. Dist., 497 So.2d 1282, 1284 (Fla. 4th DCA 1986)), I find this case law inapplicable. First, an abortion is not a medical procedure necessary to prevent "physical or mental injury to the child" in the sense addressed by the cases cited by Justice Lewis. See State v. Riker, 376 So.2d 862 (Fla.1979) (stating that the statute "seeks to punish one who, knowingly or by culpable negligence, permits physical or mental injury to the child"). Rather, abortion is a choice protected by our privacy clause. Second, in contrast to the cases cited by Justice Lewis in his opinion, the Parental Notice Act does not compel a parent to provide medical attention to his or her child. The Act mandates only notification, and does not address how a parent will respond to that notification. As Justice Lewis acknowledges, "attempting to legislate how a parent will or may respond under these most delicate of complex matters is simply beyond state control." Concurring in result only op. at 665.
[82] Assuming the existence of a compelling state interest, petitioners suggested ways to more narrowly draw a statute, such as requiring follow-up steps for minors who receive abortions to assure that they receive post-abortion care. See Petitioners' Initial Brief at 41. Petitioners also point to other states that deal with the issue in a less intrusive way. For example, Maryland provides that the notice requirement can be waived where the physician, in his or her professional judgment, determines that notice may lead to abuse of the minor, the minor is mature, or notification will not be in the minor's best interest, thereby avoiding the harms of judicial bypass. See Md.Code, HealthGen. § 20-103 (2002). In this regard, Justice Lewis misinterprets my position on this issue. The Maryland statute cited above does not "totally eliminate any possibility of parental... involvement whatsoever." Concurring in result only op. at 666. Rather, the Maryland statute actively seeks to involve parents in the abortion decision through notification. It is only under certain statutorily defined circumstances that the notice requirement may be overridden by the physician. Thus, the Maryland statute both involves parents and furthers that state's compelling interest in maternal health through less intrusive means than the statute at issue in this case, which only permits waiver of notification through a cumbersome judicial bypass procedure.
[83] Justice Lewis's concern that the majority opinion would limit the State in mandating uniform "sterile conditions for surgery, minimum certification and educational qualifications for caregivers, and even adherence to minimum medical standards for care and treatment" is unjustified. Concurring in result only op. at 660. These issues are not before us, nor do they logically flow from the majority's opinion.
[84] To the extent that Justice Wells suggests that "the rights established by Florida's right of privacy were to be those protected by the United States Constitution, particularly regarding the right to abortion," dissenting op. at 673, I note that this view would require us to recede from every decision of this Court since Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985), decisions that have consistently held that Florida's right of privacy affords greater protection to Floridians than the right of privacy derived from various provisions of the United States Constitution. See Renee B. v. Florida Agency for Health Care Admin., 790 So.2d 1036, 1039 (Fla.2001); Von Eiff v. Azicri, 720 So.2d 510, 514 (Fla.1998); Beagle v. Beagle, 678 So.2d 1271, 1276 (Fla.1996); City of North Miami v. Kurtz, 653 So.2d 1025, 1027 (Fla.1995); Public Health Trust of Dade County v. Wons, 541 So.2d 96, 102 (Fla.1989); In re T.W., 551 So.2d 1186, 1191 (Fla.1989); Shaktman v. State, 553 So.2d 148, 153 (Fla.1989) (Ehrlich, C.J., concurring specially).